ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
CALENDAR: 08
PAGE 1 of 63
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
CHANCERY DIVISION
CLERK DOROTHY BROWN

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| SARAH SPRIESCH, | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **TRIAL BY JURY DEMANDED** |
| | ) | |
| THE CITY OF CHICAGO; a municipal | ) | |
| Corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT

Plaintiff, Sarah Spriesch, formerly known as Sarah Murphy ("Ms. Murphy" or "Plaintiff"), by her attorneys, for her complaint against defendant, the City of Chicago ("the City" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      Ms. Murphy has worked for the City as an employee of the Chicago Fire Department ("CFD") since 2012. In 2014, when Ms. Murphy informed her CFD supervisor that she was pregnant, the City began an unlawful pattern of discrimination against her, relating to her pregnancy, recovery from childbirth, and need of accommodations for expressing breast milk when she returned from maternity leave. The City forced Ms. Murphy to go on leave because she was pregnant, even though she wished to continue working and was capable of performing her job duties, and required her to remain on leave until after giving birth. With limited exceptions, the City required Ms. Murphy to remain confined to her home throughout her leave and, when she returned to work, treated her leave time less favorably than it treated leave taken by other CFD employees for temporary disabilities. In addition, the City repeatedly denied Ms. Murphy accommodations for expressing breast milk while on duty – at times causing her physical pain,

**Exhibit A**

public humiliation, and emotional distress, among other injuries. Moreover, the City engaged in a series of retaliatory actions against Ms. Murphy as a result of her ongoing requests for accommodations, assertions of her legal rights, and complaints about being denied the reasonable accommodations to which she was entitled under the law.

2.      Ms. Murphy brings this action pursuant to the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*; Title VII of the United States Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Illinois Nursing Mothers in the Workplace Act ("INMWA"), 820 ILCS 260/1 *et seq.*; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, to remedy Defendant's sex discrimination, pregnancy discrimination, retaliation in employment, and unlawful denials of reasonable accommodations.

## JURISDICTION AND VENUE

3.      Jurisdiction is properly vested in this Court pursuant to Section 5/2-209 of the Illinois Code of Civil Procedure, because Defendant is a municipal corporation doing business within the State of Illinois.

4.      Jurisdiction is also invoked pursuant to 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 216(b).

5.      Venue is proper under Section 5/2-103 of the Illinois Code of Civil Procedure, because Defendant is a municipal corporation with its principal office in this judicial district.

6.      On October 5, 2015, Ms. Murphy filed timely charges with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). IDHR investigated Ms. Murphy's charge and found substantial evidence that Defendant had discriminated against her by denying her reasonable accommodations. IDHR found that Defendant:

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 2 of 63

has no policy governing or setting standards for the accommodation of breast feeding mothers in the workplace; [Ms. Murphy] was denied multiple requests to tend to her expressing of breast milk when she returned to work on April 8, 2015; and [Ms. Murphy] was required on a semi-regular basis between April and October of 2015 to depend on the discretion of coworkers to relinquish their assigned private quarters for her to secure private non-bathroom space for the purpose of expressing breast milk, otherwise was left no option but to utilize a bathroom to pump in violation of the Illinois Human Rights Act.

IDHR Notice of Substantial Evidence and Notice of Dismissal ("IDHR Notice"), attached as Exhibit 1.

7. This Complaint is filed within ninety (90) days after Ms. Murphy's receipt of the IDHR Notice and the Notice of Right to Sue from the EEOC, attached as Exhibit 2.

8. All conditions precedent to the filing of this action have been performed.

## **PARTIES**

9. Plaintiff Sarah Spriesch, formerly known as Sarah Murphy, is a citizen of the State of Illinois and a resident of Cook County. She is a nonexempt employee of Defendant the City within the meaning of 42 U.S.C. § 2000e(f),775 ILCS 5/2-101(A), 820 ILCS 260/5, 29 U.S.C. § 203(e), and 29 U.S.C. § 213. Ms. Murphy is a female of childbearing age and capacity who has been employed in CFD's Emergency Medical Services ("EMS") Division, providing emergency medical care to patients in Chicago, since October of 2012. She began her employment with the City as a Fire Paramedic for CFD. She currently holds the position of Paramedic In Charge for CFD.

10. Defendant the City is a unit of government and a municipal corporation within the State of Illinois. The City is a "person" within the meaning of 42 U.S.C. § 2000e(a), as well as an "employer" within the meaning of 42 U.S.C. § 2000e(b), 775 ILCS 5/2-101(B), 820 ILCS 260/5, and 29 U.S.C. § 203(d). The City maintains a Fire Department, CFD, in which Ms. Murphy is employed.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 3 of 63

## SUMMARY OF FACTS

### The City Forced Ms. Murphy to Take Leave Because of Her Pregnancy

11.     Ms. Murphy was a Fire Paramedic, assigned to CFD Ambulance 24, in June of 2014 when she learned she was pregnant. Shortly after learning of her pregnancy, Ms. Murphy informed her supervisor on Ambulance 24, Paramedic Field Chief Jon Zaentz ("Chief Zaentz"). She was approximately six to eight weeks pregnant at the time.

12.     At all relevant times, the City maintained a written policy relating to pregnancy for CFD employees, which states:

> The Department requires that female employees who are confirmed as being pregnant notify the Medical Section. The Medical Section will monitor the employee's condition, in conjunction with her attending physician. She will remain on duty status until she can no longer safely perform the duties required of duty status.

CFD General Order 10-011 ("the CFD Medical Procedure Order"), attached as Exhibit 3, Section III.F.1.

13.     Ms. Murphy did not request any accommodations when she spoke to Chief Zaentz, because she did not need an accommodation to continue performing her job duties at that time. Nevertheless, upon learning of Ms. Murphy's pregnancy, Chief Zaentz told Ms. Murphy that she would be required to go on leave immediately.

14.     The City placed Ms. Murphy on leave, even though she wished to continue working, was capable of performing the duties of her job, and her health care provider had not imposed any restrictions that would have prevented her from doing so. The City required Ms. Murphy to remain on leave throughout her pregnancy.

15.     In accordance with the CFD Medical Procedure Order, Section III.D.6, the City also required that Ms. Murphy be confined to her home for her entire leave for pregnancy and recovery from childbirth, except to engage in limited activities permitted under the Order, such

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 4 of 63

as attending medical appointments, obtaining food, and addressing emergency situations. Failure to comply with this home confinement would have subjected Ms. Murphy to the risk of discipline.

16.     From June 2014 until Ms. Murphy gave birth in February 2015, the City required Ms. Murphy to report in person or by phone to CFD's Medical Division on a monthly basis to confirm that she was still pregnant. During each visit to CFD's Medical Division, Ms. Murphy submitted a note from her health care provider confirming her pregnancy. None of these notes imposed any activity restrictions. No Medical Division physician ever examined Ms. Murphy during her pregnancy or spoke with her during this time.

17.     Ms. Murphy never told the Medical Division staff that there were any pregnancy-related restrictions that would have prevented her from performing her job duties. No one from the Medical Division staff ever spoke to Ms. Murphy about possible reasonable accommodations that would have allowed her to work while pregnant. With each appointment or phone call, the Medical Division staff simply continued Ms. Murphy's involuntary leave.

18.     As a result of her involuntary pregnancy leave, Ms. Murphy lost her assignment to Ambulance 24. She also lost opportunities for furlough time and additional pay that she would have earned had she been allowed to continue or return to work.

19.     Ms. Murphy also experienced harm, including pain and suffering, as a result of the City's policy requiring her to remain confined to her home for nearly the entirety of her leave for pregnancy and recovery from childbirth.

20.     Notwithstanding the written CFD Medical Procedure Order, during all relevant times, the City has engaged in a pattern and practice of requiring pregnant CFD employees to go on leave as soon as they notify CFD of their pregnancies and to remain on leave until after giving

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 5 of 63

5

birth, even if the employee wishes to work and has no relevant medical restrictions, and regardless of whether another reasonable accommodation is available.

21.     By contrast, during all relevant times, the City has granted accommodations other than leave, such as temporary detail assignments to less physically strenuous positions, to non-pregnant CFD employees who have disabilities or other conditions that interfere with their ability to perform their job duties. The City also has engaged in a pattern and practice of accommodating CFD employees who test positive for drugs or alcohol by detailing them to a temporary assignment in the Bureau of Logistics in accordance with a "Last Chance Agreement" process, instead of placing them on leave.

### The City Treated Ms. Murphy's Leave Based on Pregnancy Less Favorably Than On-the-Job Injury or Illness

22.     Ms. Murphy gave birth on February 4, 2015.

23.     Upon her return to work after giving birth, the City treated her leave time for pregnancy and childbirth less favorably than it treats leave time for other CFD employees who take leave because of a temporary disability.

24.     During all times relevant to this action, the City has had no written policy stating whether a CFD employee's leave for pregnancy and/or recovery from childbirth would be treated similarly to leave for off-duty injury or illness ("off-duty injury leave"), similarly to leave for on-the-job injury or illness ("on-the-job injury leave"), or otherwise. However, during all times relevant to this action, the City engaged in a pattern and practice of treating CFD employees' leave for pregnancy and recovery from childbirth as off-duty injury leave, and less favorably than on-the-job injury leave, for all employment-related purposes.

25.     City policies cap the total amount of paid off-duty injury leave time that CFD employees are entitled to take at twelve (12) cumulative months within any twenty-four (24)

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 6 of 63

month period. By contrast, CFD employees may take up to twelve (12) consecutive months for each on-the-job injury or illness that requires leave, regardless of how much leave they have taken in the past.

26.     A full-term pregnancy lasts approximately forty (40) weeks. Depending on the method of delivery and whether there were any complications, a woman may require several weeks to recover after childbirth before performing physically strenuous activity. Therefore, a pregnant CFD employee who provides the required notification early in her pregnancy and is promptly placed on leave by the City is likely to exhaust nearly all of her off-duty injury leave time solely because of her pregnancy and recovery from childbirth.

27.     When the Medical Division cleared Ms. Murphy to return to work on April 8, 2015, Medical Division staff provided Ms. Murphy with a document that stated that she had been on leave for 308 days, and that CFD would consider this a 308-day leave for off-duty injury or illness.

28.     Because of the City's decision to treat Ms. Murphy's leave for pregnancy and recovery for childbirth less favorably than on-the-job injury or illness, she has significantly fewer days of leave available to her should she suffer an off-duty injury or illness in the near future.

**Nursing Mothers Require Accommodations to Express Breast Milk in the Workplace**

29.     Ms. Murphy returned to work when her newborn child was approximately two months old and was breastfeeding. In order to continue to breastfeed her child, Ms. Murphy required accommodations to express breast milk while on duty.

30.     A broad consensus exists among medical and public health experts regarding the health benefits of breastfeeding, as well as the broader developmental, psychological, social, economic and environmental benefits of breastfeeding. Some women cannot or choose not to

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 7 of 63

breastfeed, but for those who do, the benefits are well established for them, their children and their communities.

31.     Women who breastfeed who have to be away from their infants for extended periods need to express breast milk on roughly the same schedule as the child's nursing schedule so that there is a supply of milk on hand for the infant when the mother is not present to breastfeed. Women must also express breast milk on a regular schedule to maintain their supply and production of breast milk, and to relieve the sometimes painful physical pressure caused by the breasts' production of milk throughout the day. If a woman who is away from her baby does not express breast milk on a regular basis consistent with the baby's feeding schedule, she will experience discomfort, pain, and engorgement of the breasts, and will be at risk of developing blocked milk ducts and infection, a reduction in milk supply, and ultimately, cessation of lactation.

32.     Nursing women generally use a device called a breast pump in order to remove milk efficiently. Use of such a device is commonly referred to as "pumping."

33.     Because breast milk is food, it should be expressed and handled in a clean environment and must be stored in a refrigerated or insulated container. Pumping in a toilet stall, bathroom, or locker room with an open toilet area poses a risk of contaminating the breast milk with pathogenic bacteria. Similarly, breast milk should not be expressed or stored in any environment (such as the back of an ambulance) where the storage or handling of food and drink is otherwise prohibited because of the likelihood of exposure to blood or other potentially infectious materials. An environment that offers comfort and relaxation is optimal for production of breast milk during nursing or pumping. Stress, physical discomfort, and inability to relax can reduce or prevent the production of breast milk during nursing or pumping.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 8 of 63

**The City Discriminated Against Ms. Murphy When She Returned to Work on April 8, 2015**

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 9 of 63

34.     Upon Ms. Murphy's return from pregnancy leave, the City obstructed her ability to safely express breast milk for her newborn child, engaging in a pattern of discriminatory conduct that led to physical harm, economic loss and emotional distress, including public humiliation.

35.     At approximately 6:30 a.m. on April 8, 2015, Ms. Murphy reported to the Medical Division for a required medical appointment to assess whether she could return to work after giving birth.

36.     During this appointment, Ms. Murphy informed Medical Division Paramedic Roula Johnson ("Paramedic Johnson") that she planned to continue breastfeeding and would need to pump to express breast milk when she returned to work. Ms. Murphy asked Paramedic Johnson what accommodations were available to her as a CFD employee who needed to express breast milk while on duty. Paramedic Johnson's only response was to tell Ms. Murphy to find someone else who had breastfed while working at CFD, and ask what they did.

37.     At approximately 9:00 a.m., the Medical Division physician, Dr. William Wong, examined Ms. Murphy briefly and cleared her to return to work.

38.     During this examination, Ms. Murphy informed Dr. Wong that she planned to continue breastfeeding and would need to pump to express breast milk when she returned to work. Dr. Wong responded, "Good for you." He did not provide Ms. Murphy with any information about what accommodations were available for CFD employees who needed to express breast milk while on duty.

39.     After Dr. Wong cleared Ms. Murphy to return to work, the Medical Division secretary instructed Ms. Murphy to report immediately to the retraining instructor, Paramedic In Charge Neal Scott ("Instructor Scott").

40.     At approximately 9:30 a.m., Ms. Murphy reported to Instructor Scott, who informed her that her retraining would begin immediately.

41.     The City typically does not send CFD employees returning from leave to retraining immediately following the employee's Medical Division appointment, but instead usually requires the employee to begin retraining the next day.

42.     When Ms. Murphy reported to retraining on April 8, 2015, she had not nursed or expressed breast milk for more than four hours, as she had left her home early in the morning in order to report to the Medical Division around 6:30 a.m. She therefore asked Instructor Scott if she could take a short break to obtain a pump and express breast milk.

43.     Instructor Scott initially did not appear to understand what a pump was, so Ms. Murphy explained to him that she was nursing a newborn baby and needed to express breast milk with a breast pump when away from her child.

44.     As CFD typically does not send employees returning from leave to retraining immediately following their Medical Division appointment, Ms. Murphy had not brought her breast pump with her. However, she told Instructor Scott that she could quickly obtain a pump from the Target store located just a few minutes from the Fire Academy building where retraining was held and begin retraining shortly thereafter.

45.     Instructor Scott denied Ms. Murphy's request. Instructor Scott then accompanied Ms. Murphy back to the Medical Division to consult with the Medical Division staff.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 10 of 63

46.     The Medical Division secretary confirmed that employees returning from leave typically are not required to begin retraining until the day after their required Medical Division appointment.

47.     Ms. Murphy asked Instructor Scott if she could start retraining the next day so that she could bring her breast pump to retraining. Instructor Scott denied this request and instructed Ms. Murphy to return with him to retraining, which she did.

48.     Ms. Murphy informed Instructor Scott that she was ready to begin retraining that day, but that she was experiencing discomfort and that her breasts would start to leak soon if she was not permitted to take a break to obtain a pump and express breast milk.

49.     This time, Instructor Scott left to consult with Deputy District Chief Edgar Ignacio Silvestrini ("Chief Ignacio"), the Director of the Medical Division.

50.     When Instructor Scott returned, he denied Ms. Murphy's request. He informed Ms. Murphy that Chief Ignacio had stated that if she left the premises to obtain a pump, she would be considered absent without leave ("AWOL").

51.     Ms. Murphy was surprised, as she was aware that the City grants breaks and the opportunity to leave the facility to Fire Academy candidates and to other CFD employees at the Fire Academy building, including breaks to smoke or accommodate other personal needs.

52.     Ms. Murphy asked Instructor Scott if she could speak to Chief Ignacio directly or if there was anyone else to whom she could speak about her need for a break to express breast milk. Instructor Scott denied this request.

53.     Between approximately 9:30 a.m. and 1:00 p.m., Ms. Murphy made multiple additional requests for a short break to obtain a pump and express breast milk, as she was experiencing increasing pain and discomfort from not being allowed to express breast milk, and

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 11 of 63

11

her breasts were beginning to leak as time wore on. Instructor Scott repeatedly consulted with

Chief Ignacio and thereafter denied these requests.

54.     Around 1:00 p.m. on April 8, 2015, Ms. Murphy was leaking milk through her

shirt, her breasts were engorged, and she was experiencing extreme discomfort. At this point,

approximately eight (8) hours had passed since she had been able to nurse or express breast milk.

Visibly upset and in tears, Ms. Murphy asked Instructor Scott again for a break to obtain a pump

and express breast milk. She informed Instructor Scott that the law requires employers to give

employees reasonable breaks to pump.

55.     At that point, Instructor Scott told Ms. Murphy that she should speak directly to

Chief Ignacio.

56.     Chief Ignacio then called Ms. Murphy back to speak with him. He told Ms.

Murphy, "I think we have a misunderstanding here." Ms. Murphy told Chief Ignacio that she

thought there might be a misunderstanding about the purpose of her request for a break, which

was to obtain a pump and express breast milk. Chief Ignacio responded, "The misunderstanding

is, if you leave, you'll be AWOL."

57.     Ms. Murphy told Chief Ignacio that she understood that candidates at the Fire

Academy were permitted to leave for breaks for other purposes, including to attend to personal

needs. Ms. Murphy also stated that the law allowed her reasonable breaks to pump.

58.     At that point, Paramedic In Charge Deborah Ford ("PIC Ford"), who was present

for this conversation with Chief Ignacio, told Ms. Murphy that she could leave the building when

she took her lunch break. Ms. Murphy asked PIC Ford when her lunch break would be, and PIC

Ford responded, "Now."

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 12 of 63

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 13 of 63

59.     During her lunch break, Ms. Murphy quickly purchased a pump from the nearby Target store and went to her car, where she expressed breast milk and changed into a clean shirt. She also called her union steward, Paramedic In Charge Joe Davilo ("PIC Davilo"), to inform him that she was being denied reasonable accommodations to express breast milk. On information and belief, PIC Davilo contacted the City's Diversity and Equal Employment Opportunity Division ("EEO Division") regarding Ms. Murphy's complaint. Ms. Murphy returned to retraining at about 1:45 p.m.

60.     During the course of the afternoon, Ms. Murphy again needed to express breast milk and asked Instructor Scott approximately three (3) times if she could take a short break. Instructor Scott ignored each of Ms. Murphy's requests. Instead of responding, he started a new video that Ms. Murphy was required to watch and told Ms. Murphy that he would return later.

61.     Ms. Murphy was not permitted to take any other breaks after her lunch break on April 8, 2015.

62.     The City's refusals to allow Ms. Murphy reasonable breaks to express breast milk that day caused Ms. Murphy physical pain from engorgement and placed her at risk of developing blocked milk ducts, infection, and a reduction in milk supply.

63.     Ms. Murphy also experienced emotional distress, shame, embarrassment and public humiliation as a result of the City's conduct that day. She was leaking through her shirt, in extreme discomfort and becoming visibly upset, all in full view of the other CFD employees who were in retraining that day and her superiors, with whom she was forced to plead for a break to relieve her discomfort.

**The City Lacks Any Policy or Training Relating to Reasonable Accommodations for Employees Who Need to Express Breast Milk While on Duty at CFD**

64. On or about April 10, 2015, Assistant Deputy Fire Commissioner Chief Mary Sheridan ("Chief Sheridan") and Human Relations Coordinator Elizabeth Crowe ("Ms. Crowe") instructed Ms. Murphy to come to the Fire Academy building for a meeting.

65. At this meeting, Chief Sheridan told Ms. Murphy that it had been wrong for CFD to deny her breaks and an opportunity to obtain a pump and express breast milk on April 8, 2015. Ms. Crowe also apologized to Ms. Murphy.

66. During this meeting, Ms. Murphy asked what accommodations would be available to her for pumping now that she was back at work. Chief Sheridan responded that she understood that the law required CFD to provide Ms. Murphy with a private, non-bathroom space to pump, but said, "I don't know how that's going to happen."

67. Chief Sheridan told Ms. Murphy that she might have to "find any place that will be quick and easy" such as "the back of an ambulance or a quiet corner," or that she might have to hand express milk quickly at a hospital. Chief Sheridan said that Ms. Murphy might have to "pump and dump once in a while," which Ms. Murphy understood to mean that she would have to discard the breast milk she expressed instead of feeding it to her baby because of the unsanitary environment in which she was likely to have to pump.

68. At no time relevant to this action, did the City have a policy governing or setting standards for accommodating an employee's need to express breast milk at work.

69. At no time relevant to this action, did the City conduct trainings for CFD officers or supervisors on how to respond to an employee's request for accommodations to express breast milk.

**The City Continued to Deny Ms. Murphy Reasonable Accommodations for Pumping**

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 14 of 63

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 15 of 63

70.     When Ms. Murphy returned to active duty as a Fire Paramedic on approximately April 16, 2015, the City continued to deny her reasonable accommodations to express breast milk. Because Ms. Murphy had lost her assignment to Ambulance 24 as a result of her leave for pregnancy and recovery from childbirth, she was assigned to the relief pool upon her return to active duty. This meant that on any given shift she would be detailed to one of any number of different ambulances, located at any number of different firehouses. Many of these firehouses offered no private, non-bathroom space accessible to Ms. Murphy for expressing breast milk. As a result, Ms. Murphy was often required to pump in a dirty restroom or in the back of an ambulance. On multiple occasions, she had to discard the breast milk she expressed because of the unsanitary environment in which she had to pump.

71.     For example, the City detailed Ms. Murphy to Ambulance 12 on April 16, 2015. Ambulance 12 is located at a firehouse that had no private sleeping quarters for a Fire Paramedic or any other private, non-bathroom space that a Fire Paramedic was entitled to use. Ms. Murphy had to express breast milk in the restroom while detailed to Ambulance 12.

72.     The City detailed Ms. Murphy to Ambulance 50 for approximately five (5) shifts during April and May 2015. Ambulance 50 is located in an older firehouse with no private sleeping quarters for a Fire Paramedic or any other private, non-bathroom space that a Fire Paramedic was entitled to use. During these shifts, Ms. Murphy was generally required to pump in a restroom that had no counter space and nowhere to sit other than a toilet. Ms. Murphy complained several times to Chief Zaentz, who supervised Ambulance 50, that being repeatedly detailed to Ambulance 50 meant that she was required to pump in a restroom. Chief Zaentz expressed sympathy but had no suggestion other than that Ms. Murphy should continue to assert her rights in the hope that the City would eventually begin accommodating her need to pump.

15

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 16 of 63

73.     On approximately June 1, 2015, Ms. Murphy secured a promotion to the position of Paramedic In Charge. Because she was a newly promoted Paramedic In Charge, Ms. Murphy was placed in the Paramedic In Charge relief pool. Numerous CFD firehouses offer private sleeping quarters for a Paramedic In Charge, and many had open spots during this time. It therefore would not have created an undue hardship for the City to consider Ms. Murphy's need to pump in deciding where she would be detailed for each shift. On information and belief, during the period of June 1, 2015 through approximately October 16, 2015, while Ms. Murphy was in the Paramedic In Charge relief pool, Ambulances 24, 51, and 35 had open spots and all were located at firehouses that would have offered Ms. Murphy access to a clean, private, non-bathroom space for expressing breast milk. Nevertheless, CFD continued to detail Ms. Murphy to ambulances at firehouses that did not accommodate her needs as a nursing mother.

74.     Numerous CFD firehouses also have private sleeping quarters designated for use by individual fire officers. Ms. Murphy regularly asked individual officers for permission to use their sleeping quarters to pump. However, permission to use the fire officers' sleeping quarters depended entirely on the whims of the individual officers, who frequently told Ms. Murphy that she would have to pump in the restroom.

75.     While the City frequently detailed Ms. Murphy to ambulances at firehouses that lacked private, non-bathroom space accessible to Ms. Murphy for expressing breast milk, the City routinely considers other personal needs in allocating shift assignments. For example, the City rearranges shift assignments to ensure that certain paramedics will not be detailed to the same ambulance as partners with whom they do not get along. On information and belief, the City also has temporarily detailed paramedics to specific ambulances of their choice to accommodate the need to be closer to a sick family member and has granted temporary detail

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 17 of 63

assignments to accommodate disabilities or medical or other conditions. The City also details

CFD employees to the Bureau of Logistics according to a "Last Chance Agreement" process by

which the City accommodates CFD employees who test positive for drugs or alcohol.

76. The City's repeated unlawful denials of accommodations for expressing breast

milk caused Ms. Murphy economic loss and emotional distress.

### The City Retaliated Against Ms. Murphy

77. In addition to unlawfully denying Ms. Murphy accommodations for pumping, the

City retaliated against Ms. Murphy as a result of her requests for accommodations and

complaints about the City's repeated refusals to accommodate her.

78. As detailed above, during retraining on April 8, 2015, Ms. Murphy made repeated

requests to Instructor Scott for reasonable accommodations in order to express breast milk and

complained about the unlawful denial of such reasonable accommodations. In response,

Instructor Scott retaliated against her by requiring her to perform additional "ride time" days

after she completed retraining and by requiring her to stay at retraining later than other

employees.

79. CFD typically requires employees returning from leave to perform one or two ride

time shifts, as is evidenced by CFD's Reinstatement Work Sheet, which is designed for an

instructor to assign at most two days of ride time (with blank spaces labeled "Ride Day 1" and

"Ride Day 2"). Ride time days are less desirable than traditional shifts because the pay is lower

and the scheduling is for daily 8-hour shifts instead of periodic 24-hour shifts.

80. At the start of Ms. Murphy's retraining on April 8, 2015, Instructor Scott asked

Ms. Murphy which ambulance she wanted to work with for her required ride time after she had

completed retraining. Ms. Murphy stated that she would like to do her ride time on Ambulance

17

21, which was convenient because it was near her home. Instructor Scott agreed and wrote down on the Reinstatement Work Sheet that Ms. Murphy would be assigned to Ambulance 21 for two days of ride time on April 9 and April 10, 2015.

81.     However, at the end of the day, after Ms. Murphy had repeatedly asserted her right to reasonable breaks for pumping and complained about the unlawful denial of such accommodations, Instructor Scott added two additional ride time days that Ms. Murphy was required to perform before returning to active duty. In addition, he scheduled her to perform the third and fourth days of ride time at Ambulance 34, which is one of the busiest CFD ambulances and is located on the other side of the city from Ambulance 21 and from Ms. Murphy's home. Instructor Scott did not offer Ms. Murphy any explanation as to why she was required to complete more ride time days than is typically required of an employee returning from leave. He also did not provide any reason for placing her at Ambulance 34 for her two final days of ride time.

82.     In addition, Instructor Scott required Ms. Murphy to stay in retraining on April 8 longer than the two male firefighters who were also in retraining that day. The male firefighters were permitted to leave retraining on April 8 at around 2:00 or 2:30 p.m. Instructor Scott required Ms. Murphy to stay to watch additional training videos until approximately 4:00 p.m. The additional training videos Ms. Murphy was required to watch had been created approximately six years earlier and did not reflect current CFD procedures.

83.     Ms. Murphy believes that Instructor Scott required her to stay later than the other employees in retraining that day in retaliation for her requests for reasonable accommodations to express breast milk and for complaining about the unlawful denial of such reasonable accommodations.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 18 of 63

18

84.     Other City employees also retaliated against Ms. Murphy because of her requests for accommodations for pumping and assertion of her legal rights, including by detailing her to ambulances that were located in firehouses that did not have appropriate facilities to accommodate her need to pump in a private, non-bathroom space and by referring to her in derogatory terms.

85.     Shortly after the April 8 incidents, Ms. Murphy submitted a grievance through her union regarding her experience on that day. The union denied the grievance on the grounds that the incidents did not involve a contractual issue. Ms. Murphy also complained to an investigator in the City's EEO Division about her experience on April 8. On information and belief, this investigator contacted employees in CFD's Human Relations Division and Training Division, including Instructor Scott, about Ms. Murphy's complaint. As a result, Ms. Murphy's requests for pumping accommodations and complaints about the City's refusal to provide them became common knowledge within CFD in April 2015.

86.     Thereafter, from approximately April 2015 through October 2015, the City retaliated against Ms. Murphy by detailing her to undesirable assignments that would not accommodate her need to express breast milk. Such assignments included ambulances located at firehouses with no private, non-bathroom space available to Ms. Murphy for expressing breast milk, as well as ambulances known to be busy, which would hinder Ms. Murphy's efforts to secure reasonable break time to express breast milk.

87.     For example, the City detailed Ms. Murphy to Ambulance 50 for approximately five (5) shifts during April and May 2015. Ambulance 50 is commonly considered to be an undesirable assignment because it is very busy. It is also located in an older firehouse where Ms. Murphy regularly was required to express breast milk in a dirty restroom.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 19 of 63

88.    On information and belief, these retaliatory shift assignments were made by Assistant Deputy Chief Paramedic Verdie Allen ("Chief Allen"), who was in charge of assignments for paramedics in the relief pool on Ms. Murphy's shift at all times relevant to this action. Ms. Murphy was informed by more than one other employee at CFD that Chief Allen referred to her derogatorily as "Breast Milk" in April 2015 and stated that she would not detail "Breast Milk" to Ambulance 51, a less-busy assignment sometimes offered to female employees as an accommodation when they return from maternity leave.

89.    The City's retaliation against Ms. Murphy caused her economic and emotional harm, including pain and suffering.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 20 of 63

## CLAIMS FOR RELIEF

### COUNT I
### Pregnancy Discrimination in Violation of the IHRA, 775 ILCS 5/2-102(I)

90.    Ms. Murphy incorporates by reference all prior paragraphs.

91.    As described above, the City discriminated against Ms. Murphy based on her pregnancy, childbirth, and related condition (lactation), in violation of the IHRA, 775 ILCS 5/2-102(I). The City's discriminatory actions included treating Ms. Murphy's leave for pregnancy and childbirth less favorably, upon her return to work, than leave for on-the-job injury or illness, and denying her reasonable accommodations for her pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

92.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

### COUNT II
### Gender Discrimination in Violation of the IHRA, 775 ILCS 5/2-102(A)

93.    Ms. Murphy incorporates by reference all prior paragraphs.

20

94.     As described above, the City discriminated against Ms. Murphy based on her gender, female, in violation of the IHRA, 775 ILCS 5/2-102(A). The City's discriminatory actions included treating Ms. Murphy's leave for pregnancy and childbirth less favorably, upon her return to work, than leave for on-the-job injury or illness, and denying her reasonable accommodations for her sex-based and pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

95.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 21 of 63

**COUNT III**
**Failure to Provide Reasonable Accommodations for Pregnancy, Childbirth and Related Conditions in Violation of the IHRA, 775 ILCS 5/2-102(J)**

96.     Ms. Murphy incorporates by reference all prior paragraphs.

97.     As described above, the City failed to provide reasonable accommodations for Ms. Murphy based on her pregnancy, childbirth, and related condition (lactation), in violation of the IHRA, 775 ILCS 5/2-102(J). The City's denials of reasonable accommodations included denying Ms. Murphy leave benefits as favorable as those provided to CFD employees who returned to work after leave for on-the-job injury or illness; failing to engage in the legally required exchange to determine effective reasonable accommodations for her pregnancy-related condition of lactation; and denying her reasonable accommodations for her pregnancy-related condition of lactation, including reasonable break time and a private, non-bathroom place to express breast milk. Such accommodations would not have imposed undue hardship on the City.

98.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's unlawful denials of reasonable accommodations.

**COUNT IV**
**Retaliation in Violation of the IHRA, 775 ILCS 5/6-101(A)**

99.     Ms. Murphy incorporates by reference all prior paragraphs.

100.     As described above, the City retaliated against Ms. Murphy for requesting reasonable accommodations in order to express breast milk and for complaining about the unlawful denial of such reasonable accommodations, in violation of the IHRA, 775 ILCS 5/6-101(A). The City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride time; requiring her to stay at retraining later than other employees who had not made such requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

101.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 22 of 63

**COUNT V**
**Sex (Pregnancy) Discrimination in Violation of Title VII,**
**42 U.S.C. § 2000e *et seq.* (Disparate Treatment)**

102.     Ms. Murphy incorporates by reference all prior paragraphs.

103.     As described above, the City discriminated against Ms. Murphy based on her sex, female, and because of her pregnancy, childbirth, or related conditions, in violation of Title VII, 42 U.S.C. § 2000e *et seq*. The City's discriminatory conduct included requiring Ms. Murphy to remain on involuntary leave based solely on her pregnancy; denying her similar accommodations for pregnancy to those granted to non-pregnant employees; treating her leave for pregnancy and childbirth less favorably than leave for on-the-job injury or illness; and denying her reasonable accommodations for her sex-based and pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

104.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

## COUNT VI
### Sex (Pregnancy) Discrimination in Violation of Title VII,
### 42 U.S.C. § 2000e *et seq.* (Disparate Impact)

105.    Ms. Murphy incorporates by reference all prior paragraphs.

106.    As described above, at all times relevant to this charge, the City's use of the CFD

Medical Procedure Order, and the CFD policy of treating off-duty injury leave less favorably

than on-the-job injury leave, had a discriminatory disparate impact on pregnant female CFD

employees which was not justified by business necessity.

107.    As described above, at all times relevant to this charge, the City's method for

detailing shift assignments for its employees, including those in the relief pool, had a

discriminatory disparate impact on lactating female CFD employees which was not justified by

business necessity.

108.    At all times relevant to this charge, less discriminatory alternatives to these

practices existed which the City refused to adopt.

109.    Ms. Murphy suffered injury, both economic and otherwise, including emotional

distress, as a result of the disparate adverse impact imposed on female pregnant and lactating

CFD employees by the City's practices.

## COUNT VII
### Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)

110.    Ms. Murphy incorporates by reference all prior paragraphs.

111.    As described above, the City retaliated against Ms. Murphy for requesting

reasonable accommodations in order to express breast milk and complaining about the unlawful

denial of such reasonable accommodations, in violation of Title VII, 42 U.S.C. § 2000e-3(a). The

City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride

time; requiring her to stay at retraining later than other employees who had not made such

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 23 of 63

23

requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

112.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

## COUNT VIII
### Violation of the INMWA, 820 ILCS 260/1 *et seq.*

113.    Ms. Murphy incorporates by reference all prior paragraphs.

114.    As described above, the City deprived Ms. Murphy of her rights under the INMWA, 820 ILCS 260/1 *et seq.*, by failing to make reasonable efforts to provide her with reasonable break time and a private, non-bathroom space to express breast milk.

115.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, because the City deprived her of her rights under the INMWA.

## COUNT IX
### Retaliation in Violation of the FLSA, 29 U.S.C. § 215(a)(3)

116.    Ms. Murphy incorporates by reference all prior paragraphs.

117.    As described above, the City retaliated against Ms. Murphy in violation of the FLSA, 29 U.S.C. § 215(a)(3). The City retaliated against Ms. Murphy for asserting her rights to reasonable break time and a private, non-bathroom place to express breast milk, 29 U.S.C. § 207(r)(1), and for complaining when the City deprived her of these rights. The City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride time; requiring her to stay at retraining later than other employees who had not made such requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 24 of 63

118.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Murphy respectfully requests that this Court award her:

a.  A declaratory judgment that the City has violated the IHRA, Title VII, the INMWA, and the FLSA;

b.  A permanent injunction enjoining the City from continuing its practices of sex discrimination, pregnancy discrimination, retaliation in employment, and unlawful denials of reasonable accommodations, and requiring the City to submit a plan detailing how it will address these violations and end its discriminatory practices and implement such plan;

c.  Compensatory damages;

d.  Pre-judgment and post-judgment interest on the above damages;

e.  Attorney's fees, costs and litigation expenses; and

f.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

By: _____

One of the Attorneys for Plaintiff

Lorie A. Chaiten, No. 46279
Amy Meek, No. 58949
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Ave., Suite 2300
Chicago, IL 60601
(312) 201-9740
lchaiten@aclu-il.org
ameek@aclu-il.org

Dated: February 14, 2017

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 25 of 63

## VERIFICATION

I, Sarah Spriesch (formerly known as Sarah Murphy), under penalties provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, hereby certify that I have read the foregoing Verified Complaint; that the factual statements set forth in this Verified Complaint are true and correct, except for those alleged on information and belief; and that I am informed and I believe that the facts alleged on information and belief are also true.

Sarah Spriesch (f.k.a. Sarah Murphy)

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 26 of 63

# Exhibit 1

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 27 of 63

STATE OF ILLINOIS       )
                           ) ss

COUNTY OF COOK       )                        **FILE NO (S) 2016CF0723**

## **AFFIDAVIT OF SERVICE**

Benetta Davies, deposes and  states that she served a copy of the attached **NOTICE  OF  SUBSTANTIAL  EVIDENCE  AND  NOTICE  OF  DISMISSAL** on  each person named below by depositing same this 9th day of November, 2016, in the U.S. Mail Box at 100 West Randolph Street, Chicago, Illinois, properly posted for FIRST CLASS MAIL, addresses as follows:

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 28 of 63

Lorie Chaiten
Roger Baldwin Foundation
of the ACLU of Illinois
180 N. Michigan Ave.
Suite 2300
Chicago, IL  60601

Hillina T. Tamrat
City of Chicago, Dept. of Law
30 N. LaSalle Street
Suite 1040
Chicago, IL  60602

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Benetta Davies

**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents.  If you wish a review of the findings in this case you must complete the Request for Review form attached.  Department staff are not permitted to discuss the investigation findings once a Notice of Dismissal has been issued.

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| SARAH MURPHY, | ) | |
| | ) | |
| COMPLAINANT, | ) | CHARGE NO.   2016CF0723 |
| | ) | EEOC NO.   21BA60041 |
| AND | ) | |
| | ) | |
| CHICAGO FIRE DEPARTMENT, | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

## NOTICE OF SUBSTANTIAL EVIDENCE
## AND NOTICE OF DISMISSAL

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 29 of 63

Lorie Chaiten
Roger Baldwin Foundation
of the ACLU of Illinois
180 N. Michigan Ave.
Suite 2300
Chicago, IL  60601

Hillina T. Tamrat
City of Chicago, Dept. of Law
30 N. LaSalle Street
Suite 1040
Chicago, IL  60602

DATE:  November 9, 2016

    The enclosed investigation report notes that the charge in this matter involves the following allegations of civil rights violations:

## DISMISSAL FOR LACK OF JURISDICTION

1.    YOU ARE HEREBY NOTIFIED that based upon the enclosed investigation report, the DEPARTMENT OF HUMAN RIGHTS (DHR) has determined that there is NOT jurisdiction to pursue the allegation(s) **A and B** of the charge.

## DISMISSAL FOR LACK OF SUBSTANTIAL EVIDENCE

2.    YOU ARE HEREBY NOTIFIED that based upon the enclosed investigation report, the DEPARTMENT OF HUMAN RIGHTS (DHR) has determined that there is NOT substantial evidence to support the allegation(s) **E** of the charge(s).

Page two
Notice of Dismissal and Notice of Substantial Evidence
Charge Number: 2016CF0723

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 30 of 63

**PROCEDURE**

3.    If Complainant disagrees with this action, Complainant may:

a)   Seek review of this dismissal before the Illinois Human Rights Commission, 100 West Randolph Street, Suite 5-100, Chicago, Illinois, 60601, by filing a "Request for Review" with the Commission by the request for review filing date below. Respondent will be notified by the Human Rights Commission if a Request for Review is filed.

**REQUEST FOR REVIEW FILING DEADLINE DATE: February 14, 2017**

Or, Complainant may:

b)   Commence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice. A complaint should be filed in the circuit court in the county where the civil rights violation was allegedly committed. **If you intend to exhaust your State remedies, please notify the Equal Employment Opportunity Commission (EEOC) immediately. The EEOC generally adopts the Department's findings.** The Appellate Courts in <u>Watkins v. Office of the State Public Defender</u>, ___ Ill.App.3d ____, 976 N.E.2d 387 (1st Dist. 2012) and <u>Lynch v. Department of Transportation,</u> ___ Ill.App.3d ___, 979 N.E.2d 113 (4th Dist. 2012), have held that discrimination complaints brought under the Illinois Human Rights Act ("IHRA") against the State of Illinois **in the Illinois Circuit Court** are barred by the State Lawsuit Immunity Act. (745 ILCS 5/1 et seq.). Complainants are encouraged to consult with an attorney prior to commencing a civil action in the Circuit Court against the State of Illinois.

4.    If an EEOC charge number is cited above, this charge was also filed with the Equal Employment Opportunity Commission (EEOC). If this charge alleges a violation under Title VII of the Civil Rights Act of 1964, as amended, or the Age Discrimination in Employment Act of 1967, Complainant has the right to request EEOC to perform a Substantial Weight Review of this dismissal. Please note that in order to receive such a review, it must be requested in writing to EEOC within fifteen (15) days of the receipt of this notice, or if a request for review is filed with the Human Rights Commission, within fifteen days of the Human Rights Commission's final order. Any request filed prior to your receipt of a final notice WILL NOT BE HONORED. Send your request for a Substantial Weight Review to EEOC, 500 West Madison Street, Suite 2000, Chicago, Illinois    60661. Otherwise, EEOC will generally adopt the Department of Human Rights' action in this case.

**Page three**
**Notice of Dismissal and Notice of Substantial Evidence**
**Charge Number 2016CF0723**

**PLEASE NOTE: BUILDING SECURITY PROCEDURES PRESENTLY IN PLACE DO NOT PERMIT ACCESS TO EEOC WITHOUT AN APPOINTMENT. IF AN APPOINTMENT IS REQUIRED, CALL 1-312-869-8000 OR 1-800-669-4000.**

## SUBSTANTIAL EVIDENCE

YOU ARE HEREBY NOTIFIED, the Director has concluded that there is substantial evidence to support allegation(s) **E, F and G.**

### PROCEDURE

1. Complainant may request that the Department file a complaint with the Human Rights Commission on his/her behalf:

   a) Within thirty (30) days of receipt of this notice Complainant must notify the Department in writing if Complainant wishes the Department to file a complaint with the Human Rights Commission pertaining to allegation(s) listed above. Complainant's request should be sent to Chief Legal Counsel, Illinois Department of Human Rights, 100 W. Randolph, Suite 10-100, Chicago, IL 60601.

   b) If Complainant wishes the Department to file a complaint with the Human Rights Commission, the Illinois Human Rights Act (Act) permits the Department to conduct conciliation as to those issues where substantial evidence has been found. Conciliation is a process in which a Department staff attorney facilitates settlement discussions with both parties via telephone.

   c) All settlement efforts are confidential. If it is determined there is not a reasonable possibility of settlement within ninety (90) days after receipt of this Notice, a complaint will be prepared against Respondent, filed with the Commission and notice of such filing shall be served on all parties, pursuant to Section 7A-102(F) of the Act. It is then the parties' responsibility to go forward with the case at the Commission.

   d) Conciliation of issues with Substantial Evidence findings does not preclude your filing a Request for Review of the issues the Department dismissed, as described above.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 31 of 63

**Page four**
**Notice of Dismissal and Notice of Substantial Evidence**
**Charge Number 2016CF0723**

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 32 of 63

e) If the Complainant fails to timely request that the Department file the complaint, the Complainant may file his or her complaint with the Commission within ninety (90) days after receipt of this Notice.  If Complainant files a complaint with the Commission, Complainant must also give notice of such filing to the Department.

Or, Complainant may:

2. Commence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice.  A complaint should be filed in the circuit court in the county where the civil rights violation was allegedly committed. **If you intend to exhaust your State remedies, please notify the Equal Employment Opportunity Commission (EEOC) immediately.  The EEOC generally adopts the Department's findings.**  The Appellate Courts in Watkins v. Office of the State Public Defender, ____ Ill.App.3d ____, 976 N.E.2d 387 (1st Dist. 2012) and Lynch v. Department of Transportation, ____ Ill.App.3d ___, 979 N.E.2d 113 (4th Dist. 2012), have held that discrimination complaints brought under the Illinois Human Rights Act ("IHRA") against the State of Illinois **in the Illinois Circuit Court** are barred by the State Lawsuit Immunity Act. (745 ILCS 5/1 et seq.). Complainants are encouraged to consult with an attorney prior to commencing a civil action in the Circuit Court against the State of Illinois.

Please note that the Department cannot provide any legal advice or assistance.  Please contact legal counsel, your city clerk, or your county clerk with any questions.

DEPARTMENT OF HUMAN RIGHTS

Janice Glenn
Acting Director

59 NOD/SPLIT
7/13

**STATE OF ILLINOIS**
**HUMAN RIGHTS COMMISSION**

IN THE MATTER OF:                )
                                 )
SARAH MURPHY,                    )
                                 )
                COMPLAINANT,     )         CHARGE NO.   2016CF0723
                                 )         EEOC NO.   21BA60041
AND                              )
                                 )
CHICAGO FIRE DEPARTMENT,         )
                                 )
                                 )
                RESPONDENT.      )

**REQUEST FOR REVIEW**

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 33 of 63

Lorie Chaiten                              Hillina T. Tamrat
Roger Baldwin Foundation                   City of Chicago, Dept. of Law
of the ACLU of Illinois                    30 N. LaSalle Street
180 N. Michigan Ave.                       Suite 1040
Suite 2300                                 Chicago, IL  60602
Chicago, IL  60601

TO:  Lorie Chaiten

DATE: November 9, 2016

**REQUEST FOR REVIEW FILING DEADLINE DATE:  February 14, 2017**

I hereby request that the Department of Human Rights' (DHR) dismissal of the charge be reviewed by the Illinois Human Rights Commission.

Complainant's Current Address (please print clearly):

_____Apt/Unit #_____


City_____State_____Zip_____Phone (____) _____

**Page two**
**Request for Review**
**Charge Number 2016CF0723**

IN THE SPACE PROVIDED BELOW, YOU <u>MUST</u> LIST AND DESCRIBE THE SPECIFIC REASONS THAT THE CHARGE SHOULD NOT HAVE BEEN DISMISSED. If applicable, you may write on the back of this form or attach additional information or documents, which support your Request for Review. You may review your investigation file, to help you prepare your request by calling 312-814-6262 or 217-785-5100. The Department's investigation file may be reviewed or copied upon request once the Department's investigation is completed. The Department is not responsible for copy service fees. A minimum of 3 business days' notice is required. Call (312) 814-6262 to make arrangements.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 34 of 63

_____                _____
SIGNATURE                                        DATE

<u>YOU MUST ENCLOSE THE ORIGINAL AND THREE COPIES, INCLUDING SUPPORTING DOCUMENTS, OF YOUR ENTIRE REQUEST AND SIGN, DATE AND HAVE THIS FORM POSTMARKED OR HAND DELIVERED BY THE FILING DEADLINE DATE ABOVE, TO:</u>

Illinois Human Rights Commission, 100 West Randolph Street, Suite 5-100, Chicago, IL 60601.

Please note that pursuant to Section 5300.410 of the Commission's Procedural Rules, except by permission of the Commission, the request, argument and supporting materials shall not exceed 30 pages.

Further, note that pursuant to *56 Ill. Admin. Code § 5300.40(b)* of the Commission's Procedural Rules, all arguments in support of the Request for Review must be written on 8 ½ x 11 paper. Any argument submitted on non-conforming paper (such as a "post-it" note) will not be considered part of the Request for Review, and will be disregarded by the Commission.

**THIS FORM MAY NOT BE SENT VIA TELEFAX**
59HRC R/R 2/14

# STATE OF ILLINOIS
## DEPARTMENT OF HUMAN RIGHTS
## INVESTIGATION REPORT

**Complainant:** Sarah Murphy       **IDHR NO.:** 2016CF0723
**Respondent:** Chicago Fire Department       **EEOC NO.:** 21BA60041

**Investigator:** <u>ABT</u> **Supervisor:** *SUR* **Date:** *9·9·16*

**Issue/Basis:**                **Finding:**

| | | | |
|---|---|---|---|
| A. | Forced medical leave/pregnancy | A. | Lack of jurisdiction |
| B. | Forced medical leave/sex, female | B. | Lack of jurisdiction |
| C. | Denial of accommodation/pregnancy | C. | Substantial Evidence |
| D. | Denial of accommodation/sex, female, related to pregnancy | D. | Substantial Evidence |
| E. | Harassment/retaliation for opposing unlawful discrimination | E. | Lack of substantial evidence |

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 35 of 63

## Jurisdiction

Alleged violations:       A & B: <u>June 16, 2014</u>
                              C - E: <u>April 8, 2015, through October 3, 2015</u>
Charge filed:                        <u>October 5, 2015</u>
Perfected date:                      <u>October 5, 2015</u>
Amendments:                        <u>None</u>
Number of employees:             <u>4,892</u>

## Verified Response

Due Date: January 8, 2016
Received: January 4, 2016
Timely __X__ Untimely _____
If untimely, good cause shown: Yes____ No____ **(Group Exhibit A)**

## Employment Data:

Respondent's Departmental Personnel Inquiry Report **(Group Exhibit B)** indicates that they employed 4,892 total persons, of which 437 (9%) are female; and of 617 Paramedics 181 (29%) are female. Respondent indicated that do not track their workforce by pregnancy related or protected activity status.

## Uncontested facts:

1. Respondent is a local government based provider of fire safety and emergency related services.

2. On October 1, 2012, Complainant was hired by Respondent as a Paramedic.

Charge No. 2016CF0723
Page 2 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 36 of 63

3.      Leading up to June of 2014, Complainant had been regularly assigned to Engine 122 under Chief John Zantes.

4.      From June 4, 2014, through April 8, 2015, Complainant was on an extended medical leave; with Complainant losing her fixed regular assignment based upon the duration of her absence.

5.      On April 8, 2015, Complainant was medically cleared by Respondent's medical offices to return to perform in her position of Paramedic; with Complainant now to be assigned to varied ambulance locations based upon Respondent's needs.

6.      In July 2015, Complainant was promoted to the position of Paramedic In-Charge.

**Complainant's Allegations-Counts A & B:**

Complainant, a Paramedic, alleges that on June 16, 2014, she was involuntarily placed on a medical leave based upon her condition of pregnancy **(Count A)**, and sex, female (related to pregnancy) **(Count B)**.

Complainant filed her charge with the IDHR on October 5, 2015. The decision to place Complainant on such leave took place on June 16, 2014, which is 478 days from the date Complainant filed her charge with IDHR.

Section 7A-102(A)(1) of the Human Rights Act states that a charge must be filed within 180 days after the date an alleged civil rights violation has been committed. Complainant charge was filed beyond 180 days the date of this harm; therefore it is untimely for IDHR.

Similarly, as the decision to place Complainant on this leave was made on June 16, 2014, is beyond 300 days prior to Complainant's filing of her charge, the EEOC also lacks jurisdiction to investigate this allegation.

**Complainant's Allegations-Counts C & D:**

Complainant, a Paramedic, alleges that from April 8, 2015, through the present (charge signed by Complainant on October 3, 2015); she was denied accommodation by Respondent related to workplace lactation based upon this pregnancy related condition **(Count C)** and sex, female, related to pregnancy **(Count D)**. Complainant alleges that she had been employed with Respondent since October of 2012 and that her performance had met Respondent's expectations. Complainant alleges that related to her condition of pregnancy, she had requested that Respondent provide private non-bathroom space for the purpose of expressing breast milk throughout this period. Complainant alleges that despite such reasonable requests, Respondent failed to ensure that such space be made available to Complainant.

Charge No. 2016CF0723
Page 3 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 37 of 63

## Respondent's Defenses-Counts C & D:

Respondent contends that Complainant was accommodated related to her breast milk expressing as best as able given the available existing facilities to which Complainant was assigned during this period.

## Investigation Summary-Counts C & D:

**A.**     **Complainant's Evidence**

1.      Complainant stated that she was hired by Respondent in October of 2012 as a union Fire Paramedic. Complainant stated that her responsibilities in this capacity included driving an ambulance on emergency calls, providing patient care on scene, as well as prepping and stocking of the emergency vehicle. Complainant stated that she would be assigned to a firehouse for a twenty-four hour shift with a Paramedic In-Charge, who oversaw her performance and assisted when necessary. Complainant stated that her performance in this position had been meeting Respondent's expectations.

2.      Complainant stated that in June of 2014, she notified Chief John Zantes of her pregnancy. Complainant stated that Zantes was aware that she had gone through In Vitro fertilization, and was familiar with the process as his family had also gone through In Vitro, leading to him immediately placing her on an off-duty "injury" leave for the remainder of her pregnancy during which she continued to receive her insurance benefits and regular salary minus her $1,000 a month drivers pay. Complainant stated that she gave birth on February 4, 2015, and remained on paid leave until April 8, 2015.

3.      Complainant stated that she returned to work on April 8, 2015, at 8:00 am reporting to Respondent's medical division at the Fire Academy South for clearance. Complainant stated that after being given the okay to return to her job without restrictions at 9:30 am that morning, she was instructed to report to instructor Neil Scott to immediately begin her retraining. Complainant stated that she believed that training would have started the next day, and informed Scott that she needed to make arrangements for childcare, which she accomplished over the phone at that time.

4.      Complainant stated that she informed Scott that she also would need to express breast milk soon as she was breastfeeding her child. Complainant stated that since she thought she was not starting training until the next day, she had neglected to bring her breast pump with her that morning. Complainant stated that Scott took her over to the medical scheduler, and asked what Respondent typically did in these situations, with no recommendation made. Complainant stated that she informed Scott that she could run across the street to the Target store and purchase a pump,

Charge No. 2016CF0723
Page 4 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 38 of 63

returning to work in about half an hour. Complainant stated that Scott went to Chief Edgar Silvestrini, and when he returned Scott informed her that he was told that if she left the premises she would be considered absent without leave (AWOL). Complainant stated that she asked Scott two more times whether she could be excused to take care of her breast pumping, as she was experiencing pain from missing her scheduled pumping and would be leaking soon. Complainant stated that Scott asked Chief Silvestrini again, with the answer still being no, and Scott declining to allow her to speak with the chief directly.

5. Complainant stated that by 11:30 am she was beginning to leak milk from her breasts and was experiencing significant discomfort and pain. Complainant stated that as lunchtime approached, she was visibly upset and crying when she informed Scott that State and Federal law required that she be provided with time to take care of her pumping needs, after which she was allowed to speak directly with Chief Silvestrini. Complainant stated that Chief Silvestrini was present, as well as Commander Deborah Ford, with Silvestrini indicating that there may have been some misunderstanding regarding the events of that morning. Complainant stated that Ford informed her that she could leave the facility for her lunch break and take care of herself at that time. Complainant stated that at noon she proceeded to drive to Target, acquired a breast pump, and expressed her breast milk in the car before returning for training at the end of the hour. Complainant stated that she was unaware whether this facility had any refrigerated place for her to store her milk, therefore simply pumped then dumped the milk.

6. Complainant stated that after returning for the remainder of the day, she continued watching training videos, then approached Scott again at 2:30 pm indicating that she needed to pump again. Complainant stated that Scott denied this request, as well as a request to use the washroom made shortly thereafter. Complainant stated that at the conclusion of training on that date, she went back to her car at 4:00 pm and pumped before going home.

7. Complainant stated that she was later contacted by Mary Sheridan, Deputy Commissioner and Elizabeth Crow in Human Resources, who indicated that someone had dropped the ball regarding her breast pumping situation on April 8th. Complainant stated that during the discussion it was affirmed that the law requires a non-bathroom area be provided for expressing milk, as well as refrigeration for storage. Complainant stated that she was asked by Sheridan and Crow to try to find out how any predecessor within the system had been accommodated related to pumping at the workplace, with Complainant not being directly aware of such. Complainant stated that she was offered the use of the back of the station

Charge No. 2016CF0723
Page 5 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 39 of 63

ambulance for pumping in the future, or any quiet corner of the building; and was asked to contact them in the future with any further concerns.

8.  Complainant stated that as part of her retraining beginning on or about April 9, 2015, she was required to ride along in an on-duty ambulance for a few days. Complainant stated that she requested that Scott place her at Ambulance 21, which is closer to home and less busy as far as call volume was concerned. Complainant stated that she was placed at Ambulance 21 for the first two days, during which she was allowed to use the Paramedic-In-Charge's room for pumping. Complainant stated that at a typical firehouse, the only individuals who have dedicated private sleeping quarters are the Paramedic In-Charge, as well as Officers of the Fire Department including the Lieutenant and Captain on duty during that twenty-four hour shift. Complainant stated that regular Paramedics such as herself at that time shared a non-private bunk house with other staff. Complainant stated that for days three and four of her ride-along assignment, she was assigned to Ambulance 34 and again was allowed to utilize a private room by the resident Paramedic In-Charge. Complainant stated that the problem with this arrangement was that the use of these rooms was predicated on the approval of other staff, and could have been declined as these designated sleeping quarters were assigned to them and not her.

9.  Complainant stated that prior to her pregnancy leave, she had held a regular Firehouse assignment, but based upon the duration of her absence had lost her permanent assignment. Complainant stated that at the conclusion of her four days of ride-alongs, she was assigned to Ambulance 50, where she remained on assignment the majority of days through September of 2015. Complainant stated that on occasion she would be bumped out to another Ambulance Unit based upon the needs of Respondent. Complainant stated that Ambulance 50 had only a men's locker room, with a separate unisex washroom with an open shower used by female staff. Complainant stated that during her assignment at Ambulance 50 she ended up having to pump in the bathroom stall. Complainant stated that she had approached Chief John Zantes about other options, but that the only dedicated private sleeping rooms were assigned to the Captain and Lieutenant on duty. Complainant stated that she offered no alternative suggestions herself, with Zantes offering no other options while indicating that he was still researching training and an official policy in this area.

10. Complainant stated that on one occasion during this timeframe, she was assigned to Ambulance 12, where she was required to use the washroom for pumping due to there being no other available accommodations. Complainant stated that when assigned to Ambulance 57, she asked to use a private room but received no response, again forcing her to use the

Charge No. 2016CF0723
Page 6 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 40 of 63

washroom stall for pumping.  Complainant stated that the option of using the ambulance did not work as there is no refrigeration in the vehicle, as well as OSHA rules prohibit food products from being present in the back of ambulances.

11.  OSHA Safety and Health Standards section 1910.1030 (**Exhibit C**) indicates that in regards to all occupational exposure to blood or other potentially infectious materials as described: eating, drinking, smoking, applying cosmetics or lip balm, and handling of contact lenses are prohibited in work areas where there is a reasonable likelihood of occupational exposure; with food and drink not being kept in refrigerators, freezers, shelves, cabinets, or on countertops/benchtops where blood or other potentially infectious materials are present.

12.  Complainant stated that she was promoted to the designation of Paramedic In-Charge on June 1, 2015, after which she was provided private sleeping quarters at many of the firehouse locations to which she was assigned through October of 2015.  Complainant stated that not all locations had dedicated quarters for the resident Paramedic In-Charge, again requiring her to either use the washroom stall or ask to displace an officer or other personnel with such quarters.  Complainant stated that during this timeframe Respondent at no time produced any form of policy or additional guidance related to the pumping of breast milk in the workplace.

**B.  Respondent's Evidence**

1.  Hillina Tamrat (female, no p/a), Senior Counsel, confirmed that Complainant was hired in October of 2012 as a Paramedic by Respondent. Tamrat confirmed that Complainant was placed on an off duty injury leave beginning in June of 2014 and remained on leave until she was cleared by Respondent's Medical Division to return to work on April 8, 2015. Tamrat likewise confirmed that Complainant was promoted to the position of Paramedic In-Charge on June 1, 2015.

2.  Respondent's Diversity and Equal Employment Opportunity Policy (**Exhibit D**) indicates that discrimination based upon an individual's race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status and military service/discharge status is prohibited, with complainant to be directed to Respondent's Diversity and EEO Division for investigation.  The policy also prohibits retaliation against any individual who asserts their rights by opposing discriminatory practices in the workplace.

Charge No. 2016CF0723
Page 7 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 41 of 63

3.  Respondent's Paramedic job description **(Exhibit E)** indicates that under the general supervision of a Paramedic In-Charge or Ambulance Commander provides emergency medical care and transportation to victims of trauma, injury and illness; as well as maintains paramedic equipment and fire house facilities, and performs related duties as required.

4.  Respondent's Paramedic In-Charge job description **(Exhibit F)** indicates that under the general supervision of an Ambulance Commander, this individual supervises an assigned ambulance crew providing emergency medical care and transportation of victims of trauma, injury or illness.

5.  Complainant's June 2, 2014, Medical Action form **(Exhibit G)** indicates that as of June 4, 2014, Complainant was placed on lay-up status based upon her cited non-duty illness/disability of pregnancy.

6.  Respondent's Pregnancy policy **(Exhibit H)** indicates that employees who are confirmed as being pregnant are to notify the Medical Section, who will monitor the employee's condition with the employee remaining on duty status until they can no longer safely perform their required duties.

7.  Respondent's Department Medical Procedure policy **(Exhibit I)** indicates that individuals determined to suffer from either a permanent or temporary condition which renders them unable to perform the duties of their position are placed on medical status (lay-up); with release from such status being conducted by the Medical Section who then notifies Manpower Central of such release.

8.  Complainant's April 8, 2015, Medical Division report **(Exhibit J)** indicates that Complainant was cleared to return to full duty following her pregnancy plus eight weeks absent from work.

9.  Edgar Silvestrini (male, no p/a), Deputy District Chief, stated that employee retraining is required for employees out of service due to medical reasons for over ninety days such as was Complainant. Silvestrini stated that Complainant was cleared by medical personnel then instructed to attend a retraining session already in progress that morning.

10. Complainant's April 8, 2015, Medical Division assignment form **(Exhibit K)** indicates that Complainant, who had entered lay-up status on June 4, 2014, and was cleared to return to work on April 8, 2015, was instructed to report to EMS-Training beginning that day at 9:03 am.

11. Neal Scott (male, no p/a), Paramedic In-Charge, stated that on April 8, 2015, Complainant had been cleared to return to work and was placed into class with two or three other Paramedic/Fire EMT's who were already in a

Charge No. 2016CF0723
Page 8 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 42 of 63

training session. Scott stated that when Complainant signed in, she told him that she needed to pump breast milk but had forgotten her pump. Scott stated that he proceeded to place her in the room to watch the training video which was in progress, and didn't immediately have an answer regarding her pumping request as this was his first exposure to such a situation.

12. Scott stated that after having Complainant complete some written drills to catch up with the class in session, Complainant expressed that she needed to pump about an hour after her first request. Scott stated that he approached Instructor Deborah Ford regarding the situation, and whether Complainant could instead be released back to work on April 10th and allowed to leave to take care of her business. Scott stated that as the Chief had already released Complainant back as a forty hour employee, she needed to stay until 4:00 pm. Scott stated that he went back to Complainant and informed her that she was required to stay on premises for the remainder of the day and didn't know what more to tell her.

13. Scott stated that Complainant then brought up the possibility that the denial of her being allowed to take care of her pumping could be a violation of the law, at which point he went back to Ford to discuss the situation. Scott stated that he then brought Complainant directly to Chief Silvestrini. Scott stated that he additionally had inquired of Complainant as to her preference for her pending ride-along days for retraining, with Complainant asking for Ambulance 21. Scott stated that he slated Complainant to work out of Ambulance 21 for her first two days and Ambulance 34 for the remaining two days of her ride-along requirement. Scott stated that Complainant made no additional requests to pump following her interaction with the Chief.

14. Complainant's April 8, 2015, Reinstatement Work Sheet (**Exhibit L**) indicates that Complainant had been assigned to Ambulance 24 prior to her lay-up, with Complainant receiving refresher training upon her return to duty on April 8, 2015; with Complainant assigned to Ambulance 21 for ride days on April 9th and 10th, and Ambulance 34 for ride days on April 13th and 14th. The document does not show that any numbers related to Complainant's ride day assignments have been crossed out or otherwise altered.

15. Silvestrini stated that in his conversation with Deborah Ford, Complainant had reportedly cited what she believed to be a legal right to pump breast milk. Silvestrini stated that it was decided that Complainant be allowed to use her one hour lunch and two fifteen minute breaks together to go home and take care of the situation. Silvestrini stated that Complainant was also offered the Commander's room for pumping at this time, with refrigerators in the medical and training areas.

Charge No. 2016CF0723
Page 9 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 43 of 63

16.    An April 9, 2015, memorandum to District Chief Donald Hroma from EMS Training Instructor Neal Scott **(Exhibit M)** indicates that Scott reported that: on April 8, 2015, Complainant was released by medical and reported to EMS training at 9:30 am; with Complainant indicating that she had not been aware that was starting retraining on that date, was nursing and needed to pump milk, but had not brought a pump. The document indicates that Scott reported that after being informed that she would need to continue training until 4:00 pm that day, Complainant indicated that she still needed to pump milk, with Scott at no time refusing such but sought further assistance from Instructor Ford regarding the matter.

17.    An April 9, 2015, memorandum to District Chief Donald Hroma from Deborah Ford, EMS Training **(Exhibit N)** indicates that at approximately 11:20 am Instructor Scott informed her that Complainant had inquired of him whether her rights were being denied related to her request to pump breast milk; with Complainant being brought back to Chief Ignacia, who granted permission for Complainant to go to the store and purchase a pump as well as pump breast milk. The memorandum indicates that Complainant was informed that after completing her day of classroom training, she would ride along with Ambulance 21 on April 9th and 10th, and Ambulance 34 on April 13th and 14th.

18.    Respondent's Break and Meal Periods policy **(Exhibit O)** indicates that forty hour employees shall be granted a paid lunch period not to exceed one one hour during each work shift, as well as a paid fifteen minute break for each half-shift worked.

19.    Respondent's Reasonable Accommodation Policy **(Exhibit P)** indicates that a reasonable accommodation is any modification to the work environment or the way that work in performed that enables a qualified individual with a disability to perform the essential functions of their job; with Respondent reserving the right to choose among effective accommodation options and is not required to provide the specific accommodation requested by an employee if another effective accommodation is available.

20.    Verdie Allen (female, no p/a), Asst. Deputy Chief Paramedic, stated that as Complainant had returned from a lengthy medical leave, she had lost her permanent assignment and would be assigned as necessary until securing another permanent assignment. Allen stated that Respondent does not track their station assignments by how busy they are, with any Paramedic being required to be able to work at any location. Allen stated that Respondent has no mechanism to track which stations are more likely to accommodate a breast feeding mother than any other.

Charge No. 2016CF0723
Page 10 of 16

21.     Respondent's Permanent Assignment and Transfer policy **(Exhibit Q)** indicates that vacancies are created when an individual retires, resigns, is promoted, transferred, discharged, or remains on authorized leave of absence in excess of three months.   The policy indicates that assignment of positions is made based upon the use of specialized training, skills, and job qualifications with the content of such determined by the employer; with relief positions not considered to be permanent assignments.

22.     Complainant's Personal History from April 1, 2015 through April 30, 2016 **(Exhibit R)** indicates that:

from April 9 through 13, 2015, Complainant was assigned to the Fire Academy South;

on April 16, 2015, Complainant was assigned to Ambulance 12;

on April 20 and 24, 2015, Complainant was assigned to Ambulance 50;

and that between May 2, 2015 and October 5, 2015, Complainant was assigned to the following Ambulance locations on twenty-four hour shifts: 24, 30, 4, 67, 51, 34, 35, 22, 12, 9, and 5 (with Complainant being assigned to these locations between one three instances each).

23.     Steven Catlett (male, no p/a), General Counsel, stated that Respondent was contacted in September of 2015 by the ACLU regarding issues with breastfeeding in the workplace without citing any specific employee. Catlett stated that after informing the attorney that if they could identify the individual they may be able to address the issue, with Complainant ultimately being identified.   Catlett stated that as Complainant had received the designation of Paramedic In-Charge in June of 2015, it was determined that she could be detailed at Ambulance 34 which dedicated quarters for a PIC, with such a move made in October of 2015.   Catlett stated that given that such assignments are made through the bargaining unit bidding process, such an assignment was made outside of this process, with Complainant otherwise not being entitled to a permanent assignment location at that time.   Catlett stated that Respondent has no policy regarding breastfeeding in the workplace, but considered such action an accommodation.

**C.     Complainant's Rebuttal**

1.     Complainant did not provide any additional information other than what was previously identified in the Complainant's Evidence section.

Charge No. 2016CF0723
Page 11 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 45 of 63

### Analysis-Counts C & D:

The Department's investigation revealed that Complainant was hired by Respondent in October of 2012 as a Paramedic; with Complainant going on a medical leave related to her pregnancy beginning on June 4, 2014, and returning to Respondent's medical center for clearance to return to work on April 8, 2015. The investigation revealed that upon being cleared to return to work at around 9:00 am on April 8, 2015, Complainant was immediately placed into forty hour status and was required to continue with retraining for the remainder of the day until 4:00 pm. The investigation revealed that Complainant reportedly made multiple requests to express breast milk that morning, with Respondent's trainer citing unfamiliarity with any policy covering this topic, at no time allowing Complainant permission to acquire a breast pump or otherwise address this issue. The investigation revealed that it was not until Complainant cited potential legal coverage for her right to pump that she met with a lead training and the medical center Chief who proceeded to allow Complainant permission to leave the facility to acquire a breast pump and time to express her breast milk before returning to training that afternoon. The investigation revealed that Complainant alleges that she requested time away from training again that same afternoon for the purpose of pumping but again was denied by the trainer. The investigation revealed that after returning to work at various fire stations between April and June of 2015, Complainant was required to either ask permission of existing staff granted designated sleeping quarters to utilize such space for the private expression of breast milk, or utilize a bathroom stall for such purposes. Respondent concedes they had no policy governing pumping of breast milk in the workplace during the timeframe of these events. The investigation revealed that Complainant was promoted to the position of Paramedic In-Charge in June of 2015, and was afforded private quarters at some, but not all, firehouse locations for the balance of the timeframe in question; with Complainant again having to either ask to displace staff from their assigned rest quarters or utilize a bathroom stall for the purpose of pumping.

### Findings and Conclusion-Counts C & D:

A finding of **Substantial Evidence** is recommended because: The Illinois Human Rights Act under the section governing reasonable accommodations related to Pregnancy and common conditions related to childbirth (775 ILCS 5/2-102(J)) cites the provision of "private non-bathroom space for expressing breast milk and breastfeeding". The Department's investigation revealed that: Respondent has no policy governing or setting standards for the accommodation of breast feeding mothers in the workplace; Complainant was denied multiple requests to tend to her expressing of breast milk when she returned to work on April 8, 2015; and Complainant was required on a semi-regular basis between April and October of 2015 to depend on the discretion of coworkers to relinquish their assigned private quarters for her to secure private non-bathroom space for the purpose of expressing breast milk, otherwise was left no option but to utilize a bathroom to pump in violation of the Illinois Human Rights Act.

Charge No. 2016CF0723
Page 12 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 46 of 63

### Complainant's Allegations-Count E:

Complainant, a Paramedic, alleges that from April 8, 2015, through the present (charge signed by Complainant on October 3, 2015) she was subjected to retaliatory harassment by Respondent in response to her requests for lactation accommodation and related complaints of unlawful workplace discrimination. Complainant alleges that she had been employed with Respondent since October of 2012 and that her performance had met Respondent's expectations. Complainant alleges that on April 8, 2015, she had both requested lactation accommodation as covered by the Illinois Human Rights Act as well as opposed what she in good faith believed to be unlawful discrimination on the part of Respondent in denying her lactation accommodate requests. Complainant alleges that Respondent subsequently subjected her to harassment which included being assigned to a busy ambulance location during retraining; being assigned to an older and busier ambulance location as her regular assignment; and being referred to as "breast milk" by unspecified members of management following her requests for accommodation. Complainant alleges that Respondent's actions followed her having engaged in protected activity within such a period of time as to raise an inference of retaliatory motivation. Complainant alleges that the harassing conduct served to create a hostile and intimidating work environment which affected her ability to perform the responsibilities of her position.

### Respondent's Defenses-Count E:

Respondent contends that Complainant was accommodated related to her breast milk expressing as best as able given the available existing facilities to which Complainant was assigned during this period. Respondent further denies that Complainant was referred to my management personnel as "breast milk" or that she was subjected to any form of discriminatory harassment.

### Investigation Summary-Counts E:

A.    **Complainant's Evidence**

    1.     See Allegations C & D: Complainant's Evidence # 5, 10 – 12.

    2.     Complainant stated that she believed that after making her request for accommodation for pumping, as well as citing legal coverage for such in the workplace, she believed that her ride-along assignment originally slated for Ambulance 21 was changed to Ambulance 34 while still in training on April 8, 2015. Complainant stated that Ambulance 21 was closer to her home, with Ambulance 34 being on the other side of the city and being among the busier work locations for ambulance calls. Complainant alleges that she was assigned to Ambulance 50 for much of the time following her complaint of unlawful workplace discrimination, an undesirable location due to it being an older and busier station house. Complainant stated that during the timeframe following her complaints on

Charge No. 2016CF0723
Page 13 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 47 of 63

April 8, 2015, she had been informed by an undisclosed coworker that she had been derogatorily referred to with the code name "breast milk" by members of management outside of her presence, with Complainant not providing any more specific detail regarding this allegation.

**B.**    **Respondent's Evidence**

1.    See Allegations C & D:  Respondent's Evidence # 13 – 23.

2.    Steven Catlett (male, no p/a), General Counsel, stated that Respondent took steps to address Complainant's accommodation request once they were aware it was considered a continuing problem.  Catlett denied that Complainant was subjected to any form of retaliatory discrimination on the part of Respondent.

**C.**    **Complainant's Rebuttal**

1.    Complainant did not provide any additional information other than what was previously identified in the Complainant's Evidence section.

**Analysis-Count E:**

The Department's investigation did not reveal that Respondent subjected Complainant to retaliation in response to her having engaged in protected activity.  The Department's investigation revealed that Complainant was hired by Respondent in October of 2012 as a Paramedic; with Complainant going on a medical leave related to her pregnancy beginning on June 4, 2014, and returning to Respondent's medical center for clearance to return to work on April 8, 2015.  The investigation revealed that upon being cleared to return to work at around 9:00 am on April 8, 2015, Complainant was immediately placed into forty hour status and was required to continue with retraining for the remainder of the day until 4:00 pm.  The investigation revealed that Complainant engaged in protected activity when she cited Respondent's refusal to allow her to breast feed on April 8, 2015, as being discriminatory; as well as through her continued requests that she be accommodated related to her pumping activities in the workplace throughout the relevant timeframe.  Complainant alleges that she was subjected to retaliation in trainer Scott's assignment of her to Ambulance 34, a busier and less convenient location, for part of her ride-along retraining when she had expressed her preference for Ambulance 12.  However, the investigation revealed that Complainant was provided Ambulance 12 for the first two days of ride-alongs with Ambulance 34 being her assignment for the last two days.  Complainant further alleges retaliation in that she was assigned to Ambulance 50, another undesirable and busy fire station after being returned to work.  The investigation revealed that for the duration of the timeframe of April through October 2015, Complainant was assigned to eleven different stations.  The investigation revealed that given Complainant's status of not being assigned to a designated permanent location, she was expected to be able to work at any location assigned to the satisfaction of Respondent despite proximity to home or how busy a particular location might be.  The

Charge No. 2016CF0723
Page 14 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 48 of 63

investigation did not reveal that Respondent's central assignment staff track or otherwise make assignments of staff related to either the level of activity of any station or its ability to accommodate breast feeding. The investigation revealed that Complainant was promoted to Paramedic In-Charge on June 1, 2015, with Complainant being provided private rest quarters at many but not all of her station assignments. The investigation revealed that after Respondent was contacted by the ACLU on Complainant's behalf in September of 2015, arrangements were made for Complainant, who was not otherwise eligible for any such permanent assignment, to be assigned to Ambulance 34 on a regular basis beginning in October of 2015, a location which had private quarters of which Complainant was eligible to avail herself. Complainant also alleges that outside of her presence she was referred to as "breast milk" by unspecified members of Respondent's management during the relevant timeframe. Complainant was unable to identify any specifics, such as the date or persons responsible for allegedly making such comments; with Respondent denying knowledge of such.

### Findings and Conclusion-Count E:

A finding of **Lack of Substantial Evidence** is recommended because: The Department's investigation did not show, nor did Complainant provide, evidence that Respondent subjected her to retaliatory treatment or conditions of employment following her having engaged in a protected activity. Evidence shows that Complainant had voiced her opposition to not being allowed to pump breast milk on April 8, 2015, citing such as violation of governing statute; as well as had continually requested accommodation of her pregnancy related condition of requiring to express breast milk post-pregnancy throughout the relevant timeframe. While Complainant alleges that Respondent's assignment of her to any specific firehouses which she deemed inconvenient, busier, or undesirable for any other reason fails to rise to the level of actionable harassment as in her position she is expected to be able to satisfactorily perform her duties regardless of her daily assignment. There is no evidence to suggest that those personnel who were involved in Complainant's daily duty assignment had any knowledge of Complainant's history of complaints or accommodation requests; with Complainant being assigned to eleven different station houses up to three times each during the relevant timeframe based upon Complainant's non-permanent assignment status. Likewise, Complainant's allegation of reportedly being referenced in a derogatory context outside of her presence fails to rise to the level of her having been subjected to actionable retaliatory harassment.

### Witness List:

A.    Complainant (ffc)
      c/o Lorie Chaiten, Attorney
      ACLU of Illinois
      180 N. Michigan Ave., Ste. 2300
      Chicago, IL 60601
      (312) 201-9740

Charge No. 2016CF0723
Page 15 of 16

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 49 of 63

B.  Neal Scott (male, no p/a), Paramedic In-Charge (ffc)
    c/o Hillina Tamrat, Senior Counsel
    City of Chicago, Department of Law
    30 N. LaSalle St., Ste. 1040
    Chicago, IL 60602
    (312) 744-3447

C.  Edgar Silvestrini (male, no p/a), Deputy District Chief (ffc)
    c/o Hillina Tamrat, Senior Counsel
    City of Chicago, Department of Law
    30 N. LaSalle St., Ste. 1040
    Chicago, IL 60602
    (312) 744-3447

D.  Verdie Allen (female, no p/a), Asst. Deputy Chief Paramedic (ffc)
    c/o Hillina Tamrat, Senior Counsel
    City of Chicago, Department of Law
    30 N. LaSalle St., Ste. 1040
    Chicago, IL 60602
    (312) 744-3447

E.  Steven Catlett (male, no p/a), CFD General Counsel (ffc)
    c/o Hillina Tamrat, Senior Counsel
    City of Chicago, Department of Law
    30 N. LaSalle St., Ste. 1040
    Chicago, IL 60602
    (312) 744-3447

F.  Hillina Tamrat (female, no p/a), Senior Counsel (ffc)
    City of Chicago, Department of Law
    30 N. LaSalle St., Ste. 1040
    Chicago, IL 60602
    (312) 744-3447

**Exhibits:**

A.  Verified Response good cause worksheet.
B.  Respondent's Departmental Personnel Inquiry Report
C.  OSHA Safety and Health Standards section 1910.1030
D.  Respondent's Diversity and Equal Employment Opportunity Policy
E.  Respondent's Paramedic job description
F.  Respondent's Paramedic In-Charge job description
G.  Complainant's June 2, 2014, Medical Action form
H.  Respondent's Pregnancy policy
I.  Respondent's Department Medical Procedure policy
J.  Complainant's April 8, 2015, Medical Division report

Charge No. 2016CF0723
Page 16 of 16

K.      Complainant's April 8, 2015, Medical Division assignment form
L.      Complainant's April 8, 2015, Reinstatement Work Sheet
M.    An April 9, 2015, memorandum to Chief Hroma from Instructor Neal Scott
N.    An April 9, 2015, memorandum to Chief Hroma from Deborah Ford, EMS Training
O.     Respondent's Break and Meal Periods policy
P.      Respondent's Reasonable Accommodation Policy
Q.     Respondent's Permanent Assignment and Transfer policy
R.      Complainant's Personal History from April 1, 2015 through April 30, 2016

IRSHELL
Rev 11/09

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 50 of 63

# Exhibit 2

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 51 of 63

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Sarah Murphy**<br>**c/o Amy Meek, Esq.**<br>**Roger Baldwin Foundation of the ACLU of Illinois**<br>**180 N. Michigan Avenue, Suite 2300**<br>**Chicago, IL 60601** | From: | **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2000**<br>**Chicago, IL 60661** |

| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **21B-2016-00041** | **Daniel Lim,**<br>**State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| [X] | More than 180 days have passed since the filing of this charge. |
| ☐ | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| [X] | The EEOC is terminating its processing of this charge. |
| ☐ | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| ☐ | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost. |
| ☐ | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/ht*

**Julianne Bowman,**
**District Director**

December 12, 2016

*(Date Mailed)*

Enclosures(s)

cc:

**CHICAGO FIRE DEPARTMENT**
**c/o Hillina T. Tamrat, Esq.**
**City of Chicago Dept of Law**
**30 N. LaSalle Street, Suite 1040**
**Chicago, IL 60602**

ELECTRONICALLY FILED 2/13/2017 3:48 PM 2016-L-002231 PAGE 2 of 13

# Exhibit 3

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 53 of 63

**GENERAL ORDER** _____ **10-011**

September 16, 2010

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 54 of 63

**SUBJECT: DEPARTMENT MEDICAL PROCEDURE**

**I.      PURPOSE**

This order:

A.      continues the established medical procedure for all uniformed employees of the Department;

B.      rescinds General Order #91-015;

C.      establishes definitions for duty related and non-duty related injury/illness, as well as duty status and non-duty status, business hours, contact information, extended medical, and

D.      becomes effective at 0800 hours on October 1, 2010.

**II.     DEFINITIONS**

A.      <u>Duty Status</u>:  This status means that the employee is capable of performing, without any restriction, the essential functions attendant to his/her career service position, including, but not limited to, any and all duties of emergency services required of the employee in the Chicago Fire Department.

B.      <u>Medical Status (Lay Up)</u>:  Any status, either permanent or temporary, which renders the employee unable to perform in duty status.

C.      <u>Medical Section Business Hours</u>:  Monday through Friday, excluding holidays, 0800 to 1600 hours.

D.      <u>Contact Information</u>:  The Medical Section is located at Fire Academy South, 1338 S. Clinton St., Chicago, IL 60607.  The telephone numbers are: Centrex: 312-746-6935; Marshall Line; 9466, Fax: 312-746-6947.

E.      <u>Extended Medical</u>:  After three (3) months of non-duty status or after six (6) months of duty status lay up, an employee may be placed on Extended Medical, resulting in the loss of assignment upon prior notification to the Union.

**III.    PROCEDURE**

A.      On-Duty Injury/Illness

When an employee becomes ill or is injured while on duty:

1

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 55 of 63

1.    At the direction of his/her immediate supervisor, an injured or ill employee will be immediately transported by CFD Ambulance to the nearest approved receiving hospital Emergency Department.

2.    Employees assigned to the Fire Prevention Bureau are to report their injury/illness to their immediate supervisor.

3.    Employees who become ill or injured while on duty must sign a release as soon as practicable for medical records to be forwarded to:

> Chicago Fire Department
> Medical Section
> 1338 South Clinton Street
> Chicago, Illinois 60607

4.    The employee's immediate supervisor shall make notifications following the chain of command and, as soon as possible, contact the Medical Section by telephone to report the injury/illness. If the injury/illness occurs during the Medical Section's non-business hours, the immediate supervisor working the next business day shall make notification to the Medical Section.

5.    The employee's Battalion Chief/Field Chief will obtain copies of the Emergency Department reports, place them in a sealed envelope marked "MEDICAL LAY UP INFORMATION" and forward them to the Medical Section, through channels, along with the Form FD 160/160A. The Medical Section shall forward such copies of said Form FD 160/160A to the C.F.F.U. Local #2. The employee shall retain all original Emergency Department documents, if possible, as well as the original discharge instructions for submission to the Medical Section.

6.    Upon discharge from the hospital, the employee shall return to duty status or be placed on medical status pursuant to the hospital Emergency Department physician's direction along with approval of Department physician or designee. The employee shall contact the Medical Section as soon as possible during normal business hours in order to make an appointment to see the Department physician. If the employee is unable to report to the Medical Section, the Medical Section will make arrangements for a home visit.

7.    When an injury or illness is duty related, after any initial emergency medical treatment and stabilization, all subsequent medical services must be approved by the Department Medical Director (a State of Illinois licensed medical physician) prior to the employee's receiving additional care. Approval shall be granted based upon the treating physician's or other medical provider's recommendation/request, if such is consistent with generally accepted medical standards within the Chicago area medical community, and shall be granted without delay. The employee

shall contact the Medical Section to request pre-approval/authorization for medical services related to the duty related injury or illness.

NOTE: NOT ALL INJURIES OR ILLNESSES THAT OCCUR ON DUTY ARE CONSIDERED DUTY RELATED. HOWEVER, WHERE THE DEPARTMENT DIRECTS AN ON-DUTY EMPLOYEE TO BE TRANSPORTED TO THE HOSPITAL EMERGENCY DEPARTMENT, THE EMPLOYEE SHALL NOT BE REQUIRED TO PAY ANY OUT-OF-POCKET EXPENSES FOR THE EMERGENCY ROOM TREATMENT AND SUBSEQUENT TREATMENT UNTIL STABILIZED. EMPLOYEES ARE ADVISED TO NOTIFY THEIR HEALTH INSURANCE CARRIER TO AVOID POSSIBLE PENALTIES IN CASE THE INJURY OR ILLNESS IS NOT DUTY RELATED.

B.  Off-Duty Injury/Illness.

An employee who becomes ill or injured while off-duty and is unable to report to work shall:

1.  Secure emergency medical treatment from a hospital or privately licensed medical physician.

2.  Obtain a licensed medical physician's certificate/Emergency Department report with the following information:

    a) Date of treatment
    b) Name of person under treatment
    c) Nature of injury/illness
    d) Estimated duration of injury/illness in days
    e) Attending physician's signature

3.  Sign a release for medical records to be forwarded to:

    Chicago Fire Department
    Medical Section
    1338 South Clinton Street
    Chicago, Illinois 60607

4.  Notify the supervisor on duty at his/her unit of assignment immediately, regardless of platoon, and inform the supervisor that he/she intends to go on medical status. Employees assigned to the Fire Prevention Bureau shall notify their unit of assignment immediately or the OEMC during non-business hours.

5.  Notify the Medical Section as soon as practicable if the injury/illness occurs during business hours or on the first business day following the injury/illness if it occurs during non-business hours.

6.  Obtain an appointment from the Medical Section.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 56 of 63

7. Deliver the original physician's certificate/Emergency Department report to the Medical Section upon the first scheduled medical appointment. If unable to comply with this provision, the employee must notify the Medical Section as soon as possible with the reason for the delay.

8. Failure to comply with the above may result in the employee's medical status not being approved and/or disciplinary action, up to and including discharge.

C. Employees on Furlough

1. Any employee on furlough who is ill, injured or is admitted to a hospital, and upon completion of furlough is unable to return to full duty status, shall comply with the same procedures as outlined in Section III, B. of this order.

D. Employees on Medical Status

1. The Medical Section will assign the employee a date and time to report to the Medical Section.

2. Employees shall report to the Medical Section on scheduled dates and times in the appropriate dress or modified dress uniform. Uniform exceptions will be made by the Medical Section command staff prior to the appointment, depending upon individual circumstances. The Medical Section will notify the District Chief/Deputy Chief Paramedic/Division Director to conduct wellness checks when employees cannot be contacted or fail to report for scheduled appointments.

3. An employee may be scheduled to report to the Medical Section on any weekday, excluding holidays, between the hours of 0800 and 1600. It is provided, however, that no employee will be required to report to the Medical Section more than six (6) times within each 30-day period or more than two (2) times in a calendar week within the first 90 days of medical status, and no more than four (4) times within each 30-day period or more than two (2) times in a calendar week after the first 90 days of medical status. Exceptions to this provision can be made in cases of unusual circumstances for medical reasons deemed necessary by the Chicago Fire Department Medical Section physician. However, if an employee is required to report to the Medical Section more frequently than stated above, that employee shall be paid at the overtime rate for the actual time spent at the Medical Section or for two (2) hours, whichever is greater.

4. Failure to report or failure to be prompt for a scheduled medical appointment without reasonable justification, may be cause for discipline.

5. Employees are not to engage in any activity which might hinder or delay their recovery.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 57 of 63

6.    An employee who is recuperating other than as an in-patient, shall remain at home or place of recuperation to allow the Department proper monitoring of the progress of such recuperation except as noted below in a) and b):

    a)    The employee may leave home or such place of recuperation for reasonable periods in pursuit of prescribed medical/dental services and treatment, to obtain food or necessities, attend religious services, attend continuing education classes to maintain their EMS license, comply with a subpoena in accordance with Department policy, go to court, vote, bring a child to or from school, or to attend to an emergency situation.

    b)    If a personal emergency situation occurs outside of the corporate boundaries of the City of Chicago, employees who are on medical status may leave the city for a limited time to attend to such emergencies only if prior approval is given by the Medical Section command staff. The employee shall notify the Medical Section either in person or by telephone and provide the telephone number and address where the emergency occurred. Employees shall also give the reason for the emergency.

    c)    Other exceptions shall require the approval of the District Chief of Personnel or his/her designee. The employee shall notify the Medical Section of his/her current telephone number and address and any other telephone number or address pursuant to authorized absences as set forth above.

    d)    Employees on Medical Status may receive unannounced visits from representatives of the Department between 1000 hours and 2000 hours, seven (7) days a week, including holidays.

7.    Being engaged in any outside employment, including self-employment while on medical status (lay up) will subject the employee to immediate disciplinary action, up to and including discharge.

8.    Platoon employees on medical status shall continue to be regarded as Platoon employees. Forty (40) hour employees on medical status shall continue to be regarded as forty (40) hour employees.

E.    Employees Released from Medical Roll

1.    Upon the employee's release from medical status, the Medical Section will immediately notify Manpower Central.

2.    The employee will then report to his/her assignment on the employee's scheduled workday and time.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 58 of 63

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 59 of 63

3.     Employee's who had a previously assigned furlough scheduled during the time of his/her duty related lay-up, shall have this furlough rescheduled as soon as possible at a mutually agreeable time within the open, unfilled furlough periods.

4.     An employee who had a previously assigned furlough scheduled during the time of his/her non-duty related lay-up, shall not have this furlough rescheduled, but will take his/her furlough which is scheduled during the time of the non-duty lay up. For the purpose of non-duty lay-up time accounting, furlough days taken during an employee's non-duty lay-up will not be counted as lay-up days when calculating employee's remaining non-duty lay-up time within a twenty-four (24) consecutive month period.

5.     Upon returning to his/her assignment, the employee's supervisor will complete three (3) copies of the Form FD 159 (Return to Duty), and immediately forward through the chain of command as follows:

> One (1) copy to the Medical Section
> One (1) copy to be retained at District/Division
> One (1) copy to the Battalion Chief/Field Chief (if applicable)

F.     Pregnancy

1.     The Department requires that female employees who are confirmed as being pregnant notify the Medical Section. The Medical Section will monitor the employee's condition, in conjunction with her attending physician. She will remain on duty status until she can no longer safely perform the duties required of duty status.

2.     An employee who receives medical confirmation that she is pregnant will:

> Notify the Medical Section, at which time an appointment will be scheduled for her to see the Department Medical section physician.

3.     When a pregnant employee reports to the Medical Section, she must bring with her a report from her obstetrician/attending physician. That report should contain the physician's medical opinion and judgment regarding whether the employee can continue to perform the duties of her career service position, and for what period of time during the term of her pregnancy the employee can continue on-duty status. The Medical Section reserves the right to ask for updated medical reports from such physician(s) as needed.

4.     The pregnant employee's medical/physical condition will be reassessed by the Medical Section physician every 30 days, or whenever conditions warrant reassessment.

G.     On-Duty Company Officer Responsibilities

When notified of an on-duty employee's injury/illness, the on-duty company officer will:

1.  Request transportation via ambulance, if necessary, for the ill or injured employee to the nearest approved receiving Emergency Department.

2.  Report the injury/illness to the Deputy District Chief/Assistant Deputy Chief Paramedic through the proper chain of command.

3.  Notify the Medical Section of the employee's injury or illness as soon as possible after the occurrence.

4.  When an injury/illness occurs during non-business hours, the on-duty Deputy District Chief/Assistant Deputy Chief Paramedic will immediately notify the OEMC, Duty Chief, and FPB Duty Chief (if applicable) and the Medical Section on the next regular business day.

5.  Make proper journal entries to include OEMC event number, if applicable.

6.  Complete six (6) copies of the Form FD 160 and immediately forward through the chain of command as follows:

    > Four (4) copies to the Medical Section
    > One (1) copy to be retained at District/Division
    > One (1) copy to Battalion Chief/Field Chief (if applicable)

7.  When additional information or late information is to be submitted, complete six (6) copies of the Form FD 160. Mark "supplemental" in the appropriate space and immediately forward through the chain of command, as noted above.

When notified of an off-duty employee's injury/illness, the on-duty company officer will:

1.  Report the injury/illness to the Deputy District Chief/Assistant Deputy Chief Paramedic through the proper chain of command.

2.  Inform the employee of the medical procedures contained in this order for which he/she is responsible.

3.  Notify the Medical Section of the employee's status immediately after receiving notification from the employee or as soon as possible:

    > When an injury/illness occurs on a holiday or weekend, the Deputy District Chief/Assistant Deputy Chief Paramedic working the first regular business day following the injury or illness, will notify the Medical Section.

4.  Make proper journal entries to include the OEMC event number, if applicable.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 60 of 63

5.      Complete six (6) copies of the Form FD 160 and immediately forward through the chain of command as follows:

>       Four (4) copies to the Medical Section
>       One (1) copy to be retained at District/Division
>       One (1) copy to  Battalion Chief/Field Chief (if applicable)

6.      When additional information or late information is to be submitted, complete six (6) copies of the Form FD 160.  Mark "supplemental" in the appropriate space and immediately forward through the chain of command, as noted above.

## IV.    INVESTIGATION

A. Battalion Chief/Field Chief Investigation

1.      Immediately upon notification, the Battalion Chief/Field Chief will investigate all on-duty injuries, illnesses or unusual medical situations which occur in his/her battalion/district under his/her command and shall prepare the Form FD 160A.

   a)      The Battalion Chief/Field Chief conducting the on-duty investigation will accurately complete the Form FD 160A. All categories will be accurately checked as they apply to the injury/illness. When a specific category cannot be checked except by "other," a statement from the employee, if possible, will be provided in the report.

   b)      After completing his/her investigation, the Battalion Chief/Field Chief will immediately forward one (1) copy of the completed Form FD 160A, through the chain of command to the Medical Section. One (1) copy of the Form FD 160A shall be forwarded to the District Chief of Safety and one (1) copy of the Form FD 160A will be maintained on file in District/Division Headquarters.

2.      If through the Battalion Chief/Field Chief's investigation, he/she discovers that the employee is going to be, or has been, admitted to a hospital, the Medical Section, the District Chief/Deputy Chief Paramedic and the District Chief of Safety will be notified immediately during business hours.  During non-business hours, notify the OEMC and request that the duty Deputy Fire Commissioner and District Chief of Personnel, or designee, be notified.

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 61 of 63

## V.    INJURY ON-DUTY REPORT (IOD)

1. Upon the District Chief/Deputy District Chief/Deputy Chief Paramedic/Assistant Deputy Chief Paramedic receipt/acceptance of Form FD 160/160A through the chain of command, the DC/DDC/DCP/ADCP will review and approve the Form FD 160/160A, to be known as Injury On Duty Report (IOD), and enter the appropriate information into the City of Chicago IOD reporting system immediately.

2. Once the IOD claim has been entered into the system, a copy of the reporting system document will be maintained at District and another will be attached to the original Form FD 160/160A (IOD) and forwarded to the Medical Section.

## VI.    MEDICAL BILLS FOR DUTY-RELATED INJURIES/ILLNESSES

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 62 of 63

A.    To avoid the burden of duty-related medical bills being the employee's responsibility, the employee must call the Medical Section for pre-approved/authorization for any subsequent treatment following the initial Emergency Department visit and stabilization. Pre-approved/authorization shall be granted based upon the attending physician's (or other medical provider's) recommendation/request and shall be granted without delay. Failure to obtain pre-authorization may result in the employee being responsible for those medical expenses.

B.    Third party forms (i.e. legal papers re: assault, automobile accidents, dog bites, etc.) must be completed and signed by the injured employee at the time he/she reports to Medical or as directed by the Medical Section.

C.    All bills received for duty-related injuries/illnesses must be immediately forwarded to:

Chicago Fire Department
Medical Section
1338 South Clinton Street
Chicago, Illinois 60607

D.    Any bill paid by an employee for Department Medical Section approved medical expenses, must be submitted with appropriate proof of payment to Medical Section Billing with a written request for reimbursement. The submission of bills shall be prompt and not withheld without sufficient reason. City payment of submitted bills shall be prompt.

## VII.    REQUIRED MEDICAL TESTS OR EXAMINATIONS FOR DUTY-RELATED INJURIES/ILLNESSES

ELECTRONICALLY FILED
2/14/2017 3:48 PM
2017-CH-02231
PAGE 63 of 63

A.     In cases of heat exhaustion, employees must take a pulmonary function test, electro cardiogram (ECG) and blood work-up.

B.     In cases of smoke inhalation, employees must take a pulmonary function test, chest X-ray, ECG, and blood work-up, which may include arterial blood gases.

C.     Injuries involving the spine or any possible fracture or sprain, require an X-ray and/or any diagnostic treatment recommended by the treating/attending physician.

D.     Medical examinations which include urine/breath testing for the presence of drugs and/or alcohol pursuant to Section IV, A.3 and A.4 of General Order #87-008 and the current Labor Contract.

E.     Medical evaluations that may be reasonably required by the Department Medical Director (State of Illinois licensed medical physician) to ascertain the employee's medical fitness for duty status.

F.     Bills for required medical tests or examinations (i.e., A. through E. above) shall be the City's responsibility and paid promptly.

## VIII.   REQUIRED MEDICAL EXAMINATIONS

A.     Medical bills for Department required examinations or tests (i.e., functional capacity tests, etc.) shall be the City's responsibility and paid promptly.

## IX.   RESPONSIBILITIES

A.     All documents containing Protected Health Information (PHI) shall be handled in accordance with the provisions set forth in General Order #03-001 (Health Insurance Portability and Accountability Act - HIPAA).

B.     It is the responsibility of all Department employees to be knowledgeable about, and comply with, the provisions of this order.

C.     It shall be the responsibility of Chief and Company Officers, or those acting in that capacity, to ensure strict compliance with the provision of this order.

**BY ORDER OF:**

*Robert S. Hoff*

**Robert S. Hoff**
**Fire Commissioner**

**TO BE READ AT FOUR (4) ROLLS CALLS AND POSTED.**

**Distribution: B**

<u>Chancery Division Civil Cover Sheet - General Chancery Section</u>                          **(Rev. 12/30/15) CCCH 0623**

### IN THE CIRCUIT CIVIL COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, COUNTY DIVISION

|  |  |
|---|---|
| SARAH SPRIESCH | |
| **Plaintiff** | |
| v. | **No.** |
| CITY OF CHICAGO | |
| **Defendant** | |

> **ELECTRONICALLY FILED**
> **2/14/2017 3:48 PM**
> **2017-CH-02231**
> **CALENDAR: 08**
> **CIRCUIT COURT OF**
> **COOK COUNTY, ILLINOIS**
> **CHANCERY DIVISION**
> **CLERK DOROTHY BROWN**

### CHANCERY DIVISION CIVIL COVER SHEET
### GENERAL CHANCERY SECTION

A Chancery Division Civil Cover Sheet - General Chancery Section shall be fi led with the initial complaint in all actions fi led in the General Chancery Section of Chancery Division. The information contained herein is for administrative purposes only. Please check the box in front of the appropriate category which best characterizes your action being filed.

| | | | | | |
|---|---|---|---|---|---|
| 0005 | ☐ Administrative Review | | | | |
| 0001 | ☐ Class Action | | | | |
| 0002 | ☐ Declaratory Judgment | | | | |
| 0004 | ☑ Injunction | | | | |

| | | | | |
|---|---|---|---|---|
| 0007 | ☐ General Chancery | 0019 | ☐ Partition |
| 0010 | ☐ Accounting | 0020 | ☐ Quiet Title |
| 0011 | ☐ Arbitration | 0021 | ☐ Quo Warranto |
| 0012 | ☐ Certiorari | 0022 | ☐ Redemption Rights |
| 0013 | ☐ Dissolution of Corporation | 0023 | ☐ Reformation of a Contract |
| 0014 | ☐ Dissolution of Partnership | 0024 | ☐ Rescission of a Contract |
| 0015 | ☐ Equitable Lien | 0025 | ☐ Specific Performance |
| 0016 | ☐ Interpleader | 0026 | ☐ Trust Construction |
| 0017 | ☐ Mandamus | 0027 | ☐ Foreign Transcript |
| 0018 | ☐ Ne Exeat | 0085 | ☐ Petition to Register Foreign Judgment |
| | | | ☐ Other (specify) _____ |

**By:** /s AMY PATRICIA MEEK

☑ **Atty. No.:** 58949          ☐ **Pro Se 99500**

**Name:** MEEK AMY P

**Atty. for:** SARAH SPRIESCH

**Address:** 180 N MICHIGAN#2300

**City/State/Zip:** CHICAGO, IL 60601

**Telephone:** (312) 201-9740

**Primary Email Address:**
ameek@aclu-il.org

**Secondary Email Address(es):**
_____
_____

<u>Pro Se Only:</u> ☐ **I have read and agree to the terms of the** *Clerk's Office Electronic Notice Policy* **and choose to opt in to electronic notice from the Clerk's office for this case at this email address:**

_____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Summons - Alias Summons** (12/31/15) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

SARAH SPRIESCH

v.

CITY OF CHICAGO

No. 2017-CH-02231

Defendant Address:
CITY OF CHICAGO
121 N LASALLE ST
ROOM 107
CHICAGO, IL 60202

☑ **SUMMONS** ☐ **ALIAS - SUMMONS**

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 802 ,Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid 1500
Rolling Meadows, IL 60008

☐ District 4 - Maywood
Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60428

☐ Richard J. Daley Center
50 W. Washington, LL-01
Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☐ Atty. No.: 58949

Name: MEEK AMY P

Atty. for: SARAH SPRIESCH

Address: 180 N MICHIGAN#2300

City/State/Zip Code: CHICAGO, IL 60601

Telephone: (312) 201-9740

Primary Email Address: ameek@aclu-il.org

Secondary Email Address(es):

Witness: Tuesday, 14 February 2017

DOROTHY BROWN, Clerk of Court

Date of Service:

(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:

(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**Page 1 of 1**