**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SARAH SPRIESCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 17 C 1952** |
| | ) | |
| **v.** | ) | **Judge Sara L. Ellis** |
| | ) | |
| **CITY OF CHICAGO, a municipal** | ) | **Magistrate Judge M. David Weisman** |
| **Corporation,** | ) | |
| **Defendant.** | ) | |

**THE CITY OF CHICAGO'S ANSWER, AFFIRMATIVE DEFENSES
AND JURY DEMAND TO PLAINTIFF'S COMPLAINT**

Defendant City of Chicago ("City"), by its attorney Edward N. Siskel, Corporation

Counsel of the City of Chicago, and for its Answer and affirmative defenses to Counts V, VII

and IX and portions of Counts I, II, III, IV of Plaintiff's Complaint, and jury demand, states as

follows:

**ANSWER TO COMPLAINT**

1.      Ms. Murphy has worked for the City as an employee of the Chicago Fire
Department ("CFD") since 2012.  In 2014, when Ms. Murphy informed her CFD supervisor that
she was pregnant, the City began an unlawful pattern of discrimination against her, relating to
her pregnancy, recovery from childbirth, and need of accommodations for expressing breast milk
when she returned from maternity leave.  The City forced Ms. Murphy to go on leave because
she was pregnant, even though she wished to continue working and was capable of performing
her job duties, and required her to remain on leave until after giving birth. With limited
exceptions, the City required Ms. Murphy to remain confined to her home throughout her leave
and, when she returned to work, treated her leave time less favorably than it treated leave taken
by other CFD employees for temporary disabilities. In addition, the City repeatedly denied Ms.
Murphy accommodations for expressing breast milk while on duty - at times causing her
physical pain,  public humiliation, and emotional distress, among other injuries. Moreover, the
City engaged in a series of retaliatory actions against Ms. Murphy as a result of her ongoing
requests for accommodations, assertions of her legal rights, and complaints about being denied
the reasonable accommodations to which she was entitled under the law.

**ANSWER:** **The City admits Plaintiff has been a CFD employee since 2012. The City denies the remaining allegations contained in paragraph 1.**

2. Ms. Murphy brings this action pursuant to the Illinois Human Rights Act ("IHRA"), 775 ILCS 511-101 et seq.; Title VII of the United States Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Illinois Nursing Mothers in the Workplace Act ("INMWA"), 820 ILCS 260/1 et seq.; and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., to remedy Defendant's sex discrimination, pregnancy discrimination, retaliation in employment, and unlawful denials of reasonable accommodations.

**ANSWER:** **The City admits Plaintiff identifies the statutes under which she purports to bring her claim. The City denies it violated any of the statutes identified in paragraph 2.**

## JURISDICTION AND VENUE

3. Jurisdiction is properly vested in this Court pursuant to Section 5/2-209 of the Illinois Code of Civil Procedure, because Defendant is a municipal corporation doing business within the State of Illinois.

**ANSWER:** **The City admits it is a municipal corporation doing business in the State of Illinois and denies that jurisdiction is properly based upon the Illinois statute identified as this matter has been removed to the federal court.**

4. Jurisdiction is also invoked pursuant to 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 216(b).

**ANSWER:** **Admit.**

5. Venue is proper under Section 5/2-103 of the Illinois Code of Civil Procedure, because Defendant is a municipal corporation with its principal office in this judicial district.

**ANSWER:** **The City admits it is a municipal corporation with its principal office in this judicial district and denies that venue is proper under the cited Illinois statute as this matter has been removed to the federal court.**

6. On October 5, 2015, Ms. Murphy filed timely charges with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission

("EEOC"). IDHR investigated Ms. Murphy's charge and found substantial evidence that Defendant had discriminated against her by denying her reasonable accommodations. IDHR found that Defendant:

> has no policy governing or setting standards for the accommodation of breast feeding mothers in the workplace; [Ms. Murphy] was denied multiple requests to tend to her expressing of breast milk when she returned to work on April 8,2015; and [Ms. Murphy] was required on a semi-regular basis between April and October of 2015 to depend on the discretion of coworkers to relinquish their assigned private quarters for her to secure private non-bathroom space for the purpose of expressing breast milk, otherwise was left no option but to utilize a bathroom to pump in violation of the Illinois Human Rights Act.

IDHR Notice of Substantial Evidence and Notice of Dismissal ("IDHR Notice"), attached as Exhibit 1.

**ANSWER:** **The City denies all of the claims covered in Plaintiff's charges were timely. The City admits that Exhibit 1 is a copy of the IDHR's Notice of Substantial Evidence and Notice of Dismissal, but denies as stated Plaintiff's characterization of its findings, and states that Exhibit 1 speaks for itself. The City further denies violating the Illinois Human Rights Act or any other law with respect to its conduct towards Plaintiff.**

7.      This Complaint is filed within ninety (90) days after Ms. Murphy's receipt of the IDHR Notice and the Notice of Right to Sue from the EEOC, attached as Exhibit 2.

**ANSWER:** **Admit.**

8.      All conditions precedent to the filing of this action have been performed.

**ANSWER:** **Deny.**

## PARTIES

9.      Plaintiff Sarah Spriesch, formerly known as Sarah Murphy, is a citizen of the State of Illinois and a resident of Cook County. She is a nonexempt employee of Defendant the City within the meaning of 42 U.S.C. § 2000e(f),775 ILCS 5/2-101(A), 820 ILCS 260/5, 29 U.S.C. § 203(e), and 29 U.S.C. § 213.  Ms. Murphy is a female of childbearing age and capacity who has been employed in CFD's Emergency Medical Services ("EMS") Division, providing emergency medical care to patients in Chicago, since October of 2012. She began her employment with the City as a Fire Paramedic for CFD. She currently holds the position of

Paramedic In Charge for CFD.

**ANSWER:** **The City admits personnel documents Plaintiff submitted reflect she is a citizen of the State of Illinois and a resident of Cook County. The City admits Plaintiff is a non-exempt employee, admits she has been employed by CFD since 2012, began her employment with the City as a Fire Paramedic, and admits her current title is Paramedic in Charge. The City lacks sufficient knowledge or information to form a belief regarding the truth of the remaining allegations.**

10.    Defendant the City is a unit of government and a municipal corporation within the State of Illinois. The City is a "person" within the meaning of 42 U.S.C. § 2000e(a), as well as an "employer" within the meaning of 42 U.S.C. § 2000e(b), 775 ILCS 5/2-1 OI(B), 820 ILCS 260/5, and 29 U.S.C. § 203(d). The City maintains a Fire Department, CFD, in which Ms. Murphy is employed.

**ANSWER:** **Admit.**

## SUMMARY OF FACTS

**The City Forced Ms. Murphy to Take Leave Because of Her Pregnancy**

**ANSWER:** **To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

11.    Ms. Murphy was a Fire Paramedic, assigned to CFD Ambulance 24, in June of 2014 when she learned she was pregnant. Shortly after learning of her pregnancy, Ms. Murphy informed her supervisor on Ambulance 24, Paramedic Field Chief Jon Zaentz ("Chief Zaentz"). She was approximately six to eight weeks pregnant at the time.

**ANSWER:** **Paragraph 11 is the subject of a motion to dismiss and, therefore, no answer**

**is made thereto.**

12.    At all relevant times, the City maintained a written policy relating to pregnancy

for CFD employees, which states:

> The Department requires that female employees who are confirmed as being pregnant notify the Medical Section. The Medical Section will monitor the employee's condition, in conjunction with her attending physician. She will remain on duty status until she can no longer safely perform the duties required of duty status.

4

CFD General Order 10-011 ("the CFD Medical Procedure Order"), attached as Exhibit 3, Section III.F.1.

**ANSWER:** **Paragraph 12 is the subject of a motion to dismiss and, therefore, no answer**

**is made thereto.**

13.     Ms. Murphy did not request any accommodations when she spoke to Chief Zaentz, because she did not need an accommodation to continue performing her job duties at that time. Nevertheless, upon learning of Ms. Murphy's pregnancy, Chief Zaentz told Ms. Murphy that she would be required to go on leave immediately.

**ANSWER:** **Paragraph 13 is the subject of a motion to dismiss and, therefore, no answer**

**is made thereto.**

14.     The City placed Ms. Murphy on leave, even though she wished to continue working, was capable of performing the duties of her job, and her health care provider had not imposed any restrictions that would have prevented her from doing so. The City required Ms. Murphy to remain on leave throughout her pregnancy.

**ANSWER:** **Paragraph 14 is the subject of a motion to dismiss and, therefore, no answer**

**is made thereto.**

15.     In accordance with the CFD Medical Procedure Order, Section III.D.6, the City also required that Ms. Murphy be confined to her home for her entire leave for pregnancy and recovery from childbirth, except to engage in limited activities permitted under the Order, such as attending medical appointments, obtaining food, and addressing emergency situations. Failure to comply with this home confinement would have subjected Ms. Murphy to the risk of discipline.

**ANSWER:** **Paragraph 15 is the subject of a motion to dismiss and, therefore, no answer**

**is made thereto.**

16.     From June 2014 until Ms. Murphy gave birth in February 2015, the City required Ms. Murphy to report in person or by phone to CFD's Medical Division on a monthly basis to confirm that she was still pregnant.  During each visit to CFD's Medical Division, Ms. Murphy submitted a note from her health care provider confirming her pregnancy.  None of these notes imposed any activity restrictions.  No Medical Division physician ever examined Ms. Murphy during her pregnancy or spoke with her during this time.

5

**ANSWER:** **Paragraph 16 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

17.    Ms. Murphy never told the Medical Division staff that there were any pregnancy-related restrictions that would have prevented her from performing her job duties.  No one from the Medical Division staff ever spoke to Ms. Murphy about possible reasonable accommodations that would have allowed her to work while pregnant.  With each appointment or phone call, the Medical Division staff simply continued Ms. Murphy's involuntary leave.

**ANSWER:** **Paragraph 17 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

18.    As a result of her involuntary pregnancy leave, Ms. Murphy lost her assignment to Ambulance 24. She also lost opportunities for furlough time and additional pay that she would have earned had she been allowed to continue or return to work.

**ANSWER:** **Paragraph 18 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

19.    Ms. Murphy also experienced harm, including pain and suffering, as a result of the City's policy requiring her to remain confined to her home for nearly the entirety of her leave for pregnancy and recovery from childbirth.

**ANSWER:** **Paragraph 19 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

20.    Notwithstanding the written CFD Medical Procedure Order, during all relevant times, the City has engaged in a pattern and practice of requiring pregnant CFD employees to go on leave as soon as they notify CFD of their pregnancies and to remain on leave until after giving birth, even if the employee wishes to work and has no relevant medical restrictions, and regardless of whether another reasonable accommodation is available.

**ANSWER:** **Paragraph 20 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

21.    By contrast, during all relevant times, the City has granted accommodations other than leave, such as temporary detail assignments to less physically strenuous positions, to non-pregnant CFD employees who have disabilities or other conditions that interfere with their

ability to perform their job duties. The City also has engaged in a pattern and practice of accommodating CFD employees who test positive for drugs or alcohol by detailing them to a temporary assignment in the Bureau of Logistics in accordance with a "Last Chance Agreement" process, instead of placing them on leave.

**ANSWER:** **Paragraph 21 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

**The City Treated Ms. Murphy's Leave Based on Pregnancy Less Favorably Than On-the-Job Injury or Illness**

**ANSWER:** **To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

22.     Ms. Murphy gave birth on February 4, 2015.

**ANSWER:** **The City admits documents provided to CFD by Plaintiff state she gave birth on this date.**

23.     Upon her return to work after giving birth, the City treated her leave time for pregnancy and childbirth less favorably than it treats leave time for other CFD employees who take leave because of a temporary disability.

**ANSWER:** **Paragraph 23 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

24.     During all times relevant to this action, the City has had no written policy stating whether a CFD employee's leave for pregnancy and/or recovery from childbirth would be treated similarly to leave for off-duty injury or illness ("off-duty injury leave"), similarly to leave for on-the-job injury or illness ("on-the-job injury leave"), or otherwise.  However, during all times relevant to this action, the City engaged in a pattern and practice of treating CFD employees' leave for pregnancy and recovery from childbirth as off-duty injury leave, and less favorably than on-the-job injury leave, for all employment-related purposes.

**ANSWER:** **Paragraph 24 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

25.     City policies cap the total amount of paid off-duty injury leave time that CFD employees are entitled to take at twelve (12) cumulative months within any twenty-four (24)

month period. By contrast, CFD employees may take up to twelve (12) consecutive months for each on-the-job injury or illness that requires leave, regardless of how much leave they have taken in the past.

**ANSWER:** **Paragraph 25 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

26. A full-term pregnancy lasts approximately forty (40) weeks. Depending on the method of delivery and whether there were any complications, a woman may require several weeks to recover after childbirth before performing physically strenuous activity. Therefore, a pregnant CFD employee who provides the required notification early in her pregnancy and is promptly placed on leave by the City is likely to exhaust nearly all of her off-duty injury leave time solely because of her pregnancy and recovery from childbirth.

**ANSWER:** **Paragraph 26 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

27. When the Medical Division cleared Ms. Murphy to return to work on April 8, 2015, Medical Division staff provided Ms. Murphy with a document that stated that she had been on leave for 308 days, and that CFD would consider this a 308-day leave for off-duty injury or illness.

**ANSWER:** **Paragraph 27 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

28. Because of the City's decision to treat Ms. Murphy's leave for pregnancy and recovery for childbirth less favorably than on-the-job injury or illness, she has significantly fewer days of leave available to her should she suffer an off-duty injury or illness in the near future.

**ANSWER:** **Paragraph 28 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

**Nursing Mothers Require Accommodations to Express Breast Milk in the Workplace**

**ANSWER:    To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

29.     Ms. Murphy returned to work when her newborn child was approximately two months old and was breastfeeding.  In order to continue to breastfeed her child, Ms. Murphy required accommodations to express breast milk while on duty.

**ANSWER:    The City admits, based on documents Plaintiff provided to CFD that Plaintiff returned to work when her child was approximately two months old.  The City lacks sufficient knowledge or information to form a belief regarding the truth of whether or not Plaintiff required an accommodation while on duty, because the phrase "required accommodations to express breast milk while on duty" is vague as to the time and place at issue and capable of multiple interpretations, and because Plaintiff did not properly seek an accommodation.**

30.     A broad consensus exists among medical and public health experts regarding the health benefits of breast feeding, as well as the broader developmental, psychological, social, economic and environmental benefits of breast feeding.  Some women cannot or choose not to breastfeed, but for those who do, the benefits are well established for them, their children and their communities.

**ANSWER:    The City lacks sufficient knowledge or information to form a belief regarding the truth of the allegations contained in paragraph 30.**

31.     Women who breastfeed who have to be away from their infants for extended periods need to express breast milk on roughly the same schedule as the child's nursing schedule so that there is a supply of milk on hand for the infant when the mother is not present to breastfeed.  Women must also express breast milk on a regular schedule to maintain their supply and production of breast milk, and to relieve the sometimes painful physical pressure caused by the breasts' production of milk throughout the day.  If a woman who is away from her baby does not express breast milk on a regular basis consistent with the baby's feeding schedule, she will experience discomfort, pain, and engorgement of the breasts, and will be at risk of developing blocked milk ducts and infection, a reduction in milk supply, and ultimately, cessation of lactation.

9

**ANSWER:** **The City lacks sufficient knowledge or information to form a belief regarding the truth of the allegations contained in paragraph 31.**

32. Nursing women generally use a device called a breast pump in order to remove milk efficiently. Use of such a device is commonly referred to as "pumping."

**ANSWER:** **Admit.**

33. Because breast milk is food, it should be expressed and handled in a clean environment and must be stored in a refrigerated or insulated container. Pumping in a toilet stall, bathroom, or locker room with an open toilet area poses a risk of contaminating the breast milk with pathogenic bacteria. Similarly, breast milk should not be expressed or stored in any environment (such as the back of an ambulance) where the storage or handling of food and drink is otherwise prohibited because of the likelihood of exposure to blood or other potentially infectious materials. An environment that offers comfort and relaxation is optimal for production of breast milk during nursing or pumping. Stress, physical discomfort, and inability to relax can reduce or prevent the production of breast milk during nursing or pumping.

**ANSWER:** **The City lacks sufficient knowledge or information to form a belief regarding the truth of the allegations contained in paragraph 33.**

**The City Discriminated Against Ms. Murphy When She Returned to Work on April 8, 2015**

**ANSWER:** **To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

34. Upon Ms. Murphy's return from pregnancy leave, the City obstructed her ability to safely express breast milk for her newborn child, engaging in a pattern of discriminatory conduct that led to physical harm, economic loss and emotional distress, including public humiliation.

**ANSWER:** **Denied.**

35. At approximately 6:30 a.m. on April 8, 2015, Ms. Murphy reported to the Medical Division for a required medical appointment to assess whether she could return to work after giving birth.

**ANSWER:** **Admit.**

36.     During this appointment, Ms. Murphy informed Medical Division Paramedic Roula Johnson ("Paramedic Johnson") that she planned to continue breastfeeding and would need to pump to express breast milk when she returned to work.  Ms. Murphy asked Paramedic Johnson what accommodations were available to her as a CFD employee who needed to express breast milk while on duty.  Paramedic Johnson's only response was to tell Ms. Murphy to find someone else who had breastfed while working at CFD, and ask what they did.

**ANSWER:     Denied.**

37.     At approximately 9:00 a.m., the Medical Division physician, Dr. William Wong, examined Ms. Murphy briefly and cleared her to return to work.

**ANSWER:     Admit.**

38.     During this examination, Ms. Murphy informed Dr. Wong that she planned to continue breastfeeding and would need to pump to express breast milk when she returned to work. Dr. Wong responded, "Good for you." He did not provide Ms. Murphy with any information about what accommodations were available for CFD employees who needed to express breast milk while on duty.

**ANSWER:     The City admits Dr. Wong responded positively to Plaintiff's discussion regarding breastfeeding and further admits he did not have information with which to provide Plaintiff at that time.  To the extent the remainder of Plaintiff's allegations contained in paragraph 38 assert any wrongdoing by the City, denied.**

39.     After Dr. Wong cleared Ms. Murphy to return to work, the Medical Division secretary instructed Ms. Murphy to report immediately to the retraining instructor, Paramedic In Charge Neal Scott ("Instructor Scott").

**ANSWER:     Admit.**

40.     At approximately 9:30 a.m., Ms. Murphy reported to Instructor Scott, who informed her that her retraining would begin immediately.

**ANSWER:     Admit.**

41.     The City typically does not send CFD employees returning from leave to retraining immediately following the employee's Medical Division appointment, but instead usually requires the employee to begin retraining the next day.

11

**ANSWER:**     **Denied.**

42.    When Ms. Murphy reported to retraining on April 8, 2015, she had not nursed or expressed breast milk for more than four hours, as she had left her home early in the morning in order to report to the Medical Division around 6:30 a.m.  She therefore asked Instructor Scott if she could take a short break to obtain a pump and express breast milk.

**ANSWER:**     **The City denies that Plaintiff requested a short break to obtain a pump and express breast milk of Instructor Scott upon reporting to retraining.  The City lacks knowledge or information to form a belief regarding the remaining allegations contained in paragraph 42.**

43.    Instructor Scott initially did not appear to understand what a pump was, so Ms. Murphy explained to him that she was nursing a newborn baby and needed to express breast milk with a breast pump when away from her child.

**ANSWER:**     **The City lacks sufficient knowledge or information to form a belief regarding the truth of how Scott "appeared" to Plaintiff.  The City admits Plaintiff advised Scott that she had not brought a breast pump with her on that day and denies the remaining allegations contained in paragraph 43.**

44.    As CFD typically does not send employees returning from leave to retraining immediately following their Medical Division appointment, Ms. Murphy had not brought her breast pump with her.  However, she told Instructor Scott that she could quickly obtain a pump from the Target store located just a few minutes from the Fire Academy building where retraining was held and begin retraining shortly thereafter.

**ANSWER:**     **The City denies that CFD employees returning from leave to retraining are not typically sent to retraining immediately.  The City admits that on the day in question, Plaintiff stated she had not brought her pump with her, but lacks knowledge or information sufficient to form a belief as to the truth of why she had not done so. The City denies that Plaintiff told Scott that she could go to Target and obtain a pump.**

12

45.    Instructor Scott denied Ms. Murphy's request. Instructor Scott then accompanied Ms. Murphy back to the Medical Division to consult with the Medical Division staff.

**ANSWER:    The City denies Instructor Scott denied Plaintiff's request.  The City admits Instructor Scott accompanied Plaintiff back to the medical section because she told him she wished to be released for the day.**

46.    The Medical Division secretary confirmed that employees returning from leave typically are not required to begin retraining until the day after their required Medical Division appointment.

**ANSWER:    The City denies the Medical Division has a secretary and further denies employees returning from leave are not typically required to begin training until the day after their required Medical Section appointment.**

47.    Ms. Murphy asked Instructor Scott if she could start retraining the next day so that she could bring her breast pump to retraining.  Instructor Scott denied this request and instructed Ms. Murphy to return with him to retraining, which she did.

**ANSWER:    Deny.**

48.    Ms. Murphy informed Instructor Scott that she was ready to begin retraining that day, but that she was experiencing discomfort and that her breasts would start to leak soon if she was not permitted to take a break to obtain a pump and express breast milk.

**ANSWER:    The City denies Plaintiff told Instructor Scott that she was experiencing discomfort, and denies he denied her the opportunity to take a break to obtain a pump, but admits that Plaintiff did inform Instructor Scott that she needed to pump.**

49.    This time, Instructor Scott left to consult with Deputy District Chief Edgar Ignacio Silvestrini ("Chief Ignacio"), the Director of the Medical Division.

**ANSWER:    Deny.**

50.    When Instructor Scott returned, he denied Ms. Murphy's request. He informed Ms. Murphy that Chief Ignacio had stated that if she left the premises to obtain a pump, she would be considered absent without leave ("AWOL").

13

**ANSWER:**     **Deny.**

51.     Ms. Murphy was surprised, as she was aware that the City grants breaks and the opportunity to leave the facility to Fire Academy candidates and to other CFD employees at the Fire Academy building, including breaks to smoke or accommodate other personal needs.

**ANSWER:     The City lacks sufficient knowledge or information to form a belief regarding the truth of whether Plaintiff was surprised by anyone's actions or of what she is aware. The City admits it grants personnel at the Fire Academy breaks, and denies that it denied breaks to Plaintiff.**

52.     Ms. Murphy asked Instructor Scott if she could speak to Chief Ignacio directly or if there was anyone else to whom she could speak about her need for a break to express breast milk. Instructor Scott denied this request.

**ANSWER:     The City denies Plaintiff asked to speak to Chief Ignacio and denies the remaining allegations contained in paragraph 52.**

53.     Between approximately 9:30 a.m. and 1:00 p.m., Ms. Murphy made multiple additional requests for a short break to obtain a pump and express breast milk, as she was experiencing increasing pain and discomfort from not being allowed to express breast milk, and her breasts were beginning to leak as time wore on.  Instructor Scott repeatedly consulted with Chief Ignacio and thereafter denied these requests.

**ANSWER:     The City denies the allegations of paragraph 53, and states that Plaintiff was advised by Chief Ignacio that she could leave and obtain a pump and take care of her personal needs and that Plaintiff did, in fact, leave the facility.**

54.     Around 1:00 p.m. on April 8, 2015, Ms. Murphy was leaking milk through her shirt, her breasts were engorged, and she was experiencing extreme discomfort.  At this point, approximately eight (8) hours had passed since she had been able to nurse or express breast milk. Visibly upset and in tears, Ms. Murphy asked Instructor Scott again for a break to obtain a pump and express breast milk.  She informed Instructor Scott that the law requires employers to give employees reasonable breaks to pump.

14

**ANSWER:** **The City admits Plaintiff mentioned the law when she spoke to Instructor Scott about needing to pump and denies the remaining allegations contained in paragraph 54.**

55.     At that point, Instructor Scott told Ms. Murphy that she should speak directly to Chief Ignacio.

**ANSWER:** **Denied.**

56.     Chief Ignacio then called Ms. Murphy back to speak with him. He told Ms. Murphy, "I think we have a misunderstanding here." Ms. Murphy told Chief Ignacio that she thought there might be a misunderstanding about the purpose of her request for a break, which was to obtain a pump and express breast milk. Chief Ignacio responded, "The misunderstanding is, if you leave, you'll be AWOL."

**ANSWER:** **The City denies Chief Ignacio called Plaintiff back to speak with him, but admits that Chief Ignacio spoke to Plaintiff. The City admits that there was some discussion regarding a misunderstanding and denies Plaintiff told Chief Ignacio that she thought there was a misunderstanding about the purpose of her request for a break. The City denies Chief Ignacio made the statement alleged in the last sentence of paragraph 56, and states that Chief Ignacio gave Plaintiff permission to leave to obtain and/or use a pump.**

57.     Ms. Murphy told Chief Ignacio that she understood that candidates at the Fire Academy were permitted to leave for breaks for other purposes, including attending to personal needs. Ms. Murphy also stated that the law allowed her reasonable breaks to pump.

**ANSWER:** **Denied.**

58.     At that point, Paramedic In Charge Deborah Ford ("PIC Ford"), who was present for this conversation with Chief Ignacio, told Ms. Murphy that she could leave the building when she took her lunch break. Ms. Murphy asked PIC Ford when her lunch break would be, and PIC Ford responded, "Now."

15

**ANSWER:** **The City admits Deborah Ford was present when Plaintiff spoke to Chief Ignacio and admits that Ford advised Plaintiff that she could leave the facility at that time to take care of her personal needs.**

59. During her lunch break, Ms. Murphy quickly purchased a pump from the nearby Target store and went to her car, where she expressed breast milk and changed into a clean shirt. She also called her union steward, Paramedic In Charge Joe Davilo ("PIC Davilo"), to inform him that she was being denied reasonable accommodations to express breast milk. On information and belief, PIC Davilo contacted the City's Diversity and Equal Employment Opportunity Division ("EEO Division") regarding Ms. Murphy's complaint.   Ms. Murphy returned to retraining at about 1:45 p.m.

**ANSWER:** **The City admits Plaintiff phoned her union steward who phoned the City's Diversity and EEO Division.   The City lacks sufficient knowledge or information to form a belief regarding the truth of the remaining allegations contained in paragraph 59.**

60. During the course of the afternoon, Ms. Murphy again needed to express breast milk and asked Instructor Scott approximately three (3) times if she could take a short break. Instructor Scott ignored each of Ms. Murphy's requests.  Instead of responding, he started a new video that Ms. Murphy was required to watch and told Ms. Murphy that he would return later.

**ANSWER:** **The City lacks sufficient knowledge or information as to whether or not Plaintiff needed to express milk in the afternoon.  The City denies the remaining allegations of paragraph 60.**

61. Ms. Murphy was not permitted to take any other breaks after her lunch break on April 8, 2015.

**ANSWER:** **Denied.**

62. The City's refusals to allow Ms. Murphy reasonable breaks to express breast milk that day caused Ms. Murphy physical pain from engorgement and placed her at risk of developing blocked milk ducts, infection, and a reduction in milk supply.

**ANSWER:** **The City denies that any actions taken by the City put Plaintiff at risk as identified or caused her physical pain.**

16

63.     Ms. Murphy also experienced emotional distress, shame, embarrassment and public humiliation as a result of the City's conduct that day. She was leaking through her shirt, in extreme discomfort and becoming visibly upset, all in full view of the other CFD employees who were in retraining that day and her superiors, with whom she was forced to plead for a break to relieve her discomfort.

**ANSWER:     The City denies the allegations contained in paragraph 63.**

**The City Lacks Any Policy or Training Relating to Reasonable Accommodations for Employees Who Need to Express Breast Milk While on Duty at CFD**

**ANSWER:     To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

64.     On or about April 10, 2015, Assistant Deputy Fire Commissioner Chief Mary Sheridan ("Chief Sheridan") and Human Relations Coordinator Elizabeth Crowe ("Ms. Crowe") instructed Ms. Murphy to come to the Fire Academy building for a meeting.

**ANSWER:     The City denies Chief Sheridan or Ms. Crowe instructed Plaintiff to come to the Fire Academy for a meeting on or about April 10, 2015.**

65.     At this meeting, Chief Sheridan told Ms. Murphy that it had been wrong for CFD to deny her breaks and an opportunity to obtain a pump and express breast milk on April 8, 2015. Ms. Crowe also apologized to Ms. Murphy.

**ANSWER:     To the extent paragraph 65 alleges Chief Sheridan admitted the City's actions were illegal, denied.  The City further denies Ms. Crowe apologized for the City's actions.**

66.     During this meeting, Ms. Murphy asked what accommodations would be available to her for pumping now that she was back at work. Chief Sheridan responded that she understood that the law required CFD to provide Ms. Murphy with a private, non-bathroom space to pump, but said, "1 don't know how that's going to happen."

**ANSWER:     The City admits Plaintiff inquired about pumping accommodations and admits only that Chief Sheridan advised Plaintiff of the actions she undertook when she**

**was breast feeding her children. The City denies Sheridan said "I don't know how that's**

**going to happen."**

67.     Chief Sheridan told Ms. Murphy that she might have to "find any place that will be quick and easy" such as "the back of an ambulance or a quiet corner," or that she might have to hand express milk quickly at a hospital. Chief Sheridan said that Ms. Murphy might have to "pump and dump once in a while," which Ms. Murphy understood to mean that she would have to discard the breast milk she expressed instead of feeding it to her baby because of the unsanitary environment in which she was likely to have to pump.

**ANSWER:     The City admits only that Chief Sheridan relayed her own breast feeding**

**experiences to Plaintiff and denies advising Plaintiff she would be required to breastfeed in**

**the same manner. The City lacks sufficient knowledge or information to form a belief**

**regarding the truth of what Plaintiff understood Chief Sheridan to mean.**

68.     At no time relevant to this action, did the City have a policy governing or setting standards for accommodating an employee's need to express breast milk at work.

**ANSWER:     Deny.**

69.     At no time relevant to this action, did the City conduct trainings for CFD officers or supervisors on how to respond to an employee's request for accommodations to express breast milk.

**ANSWER:     Deny.**

**The City Continued to Deny Ms. Murphy Reasonable Accommodations for Pumping**

**ANSWER:     To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

70.     When Ms. Murphy returned to active duty as a Fire Paramedic on approximately April 16, 2015, the City continued to deny her reasonable accommodations to express breast milk. Because Ms. Murphy had lost her assignment to Ambulance 24 as a result of her leave for pregnancy and recovery from childbirth, she was assigned to the relief pool upon her return to active duty. This meant that on any given shift she would be detailed to one of any number of different ambulances, located at any number of different firehouses. Many of these firehouses offered no private, non-bathroom space accessible to Ms. Murphy for expressing breast milk. As a result, Ms. Murphy was often required to pump in a dirty restroom or in the back of an

18

ambulance.  On multiple occasions, she had to discard the breast milk she expressed because of the unsanitary environment in which she had to pump.

**ANSWER:**     **The City admits Plaintiff returned to active duty on approximately April 16, 2015 and denies Plaintiff was denied reasonable accommodation.  The City admits that like every other paramedic returning from leave for a certain length of time, Plaintiff was no longer assigned to her original ambulance and admits Plaintiff became part of the relief pool and admits Plaintiff was assigned to various firehouses.  The City admits its firehouses have different configurations and are of different ages and contain different facilities, but denies that on said shifts, Plaintiff had no ability to access private, non-bathroom space to express breast milk.  The City denies Plaintiff was required to pump in dirty restrooms or in the back of ambulances.  The City lacks knowledge or information sufficient to form a belief regarding the truth of whether Plaintiff discarded her breast milk because of an unsanitary environment in which she pumped, but denies she had to pump in such an environment.  The City affirmatively states that Plaintiff did not request an accommodation when she returned to active duty.**

71.     For example, the City detailed Ms. Murphy to Ambulance 12 on April 16, 2015. Ambulance 12 is located at a firehouse that had no private sleeping quarters for a Fire Paramedic or any other private, non-bathroom space that a Fire Paramedic was entitled to use.  Ms. Murphy had to express breast milk in the restroom while detailed to Ambulance 12.

**ANSWER:**     **The City admits Plaintiff was detailed to Ambulance 12 for her shift on April 16, 2015.  The City lacks sufficient knowledge or information to form a belief regarding the truth of what is meant by the term "private."  The City denies that on said shifts, Plaintiff had no ability to access private, non-bathroom space to express breast milk, and denies it**

19

**required Plaintiff to express milk in the restroom and affirmatively states that Plaintiff did**

**not request an accommodation when she was returned to active duty.**

72.     The City detailed Ms. Murphy to Ambulance 50 for approximately five (5) shifts during April and May 2015. Ambulance 50 is located in an older firehouse with no private sleeping quarters for a Fire Paramedic or any other private, non-bathroom space that a Fire Paramedic was entitled to use. During these shifts, Ms. Murphy was generally required to pump in a restroom that had no counter space and nowhere to sit other than a toilet. Ms. Murphy complained several times to Chief Zaentz, who supervised Ambulance 50, that being repeatedly detailed to Ambulance 50 meant that she was required to pump in a restroom. Chief Zaentz expressed sympathy but had no suggestion other than that Ms. Murphy should continue to assert her rights in the hope that the City would eventually begin accommodating her need to pump.

**ANSWER:     The City denies it detailed Plaintiff to Ambulance 50 for five shifts during**

**April and May 2015.  The City lacks sufficient knowledge or information to form a belief**

**regarding the truth of what is meant by the term "private."  The City denies that on said**

**shifts, Plaintiff had no ability to access "private," non-bathroom space to express breast**

**milk.  The City admits Ambulance 50 is located in an older firehouse and denies that there**

**are no available sleeping quarters located within this firehouse.  The City denies Plaintiff**

**was required to pump in a restroom during her shifts on Ambulance 50 and affirmatively**

**states that Plaintiff did not request an accommodation when she was returned to active**

**duty.  The City admits Chief Zaentz supervised Ambulance 50, but denies that Plaintiff**

**complained to him, and denies the remaining allegations contained in paragraph 72.**

73.     On approximately June 1, 2015, Ms. Murphy secured a promotion to the position of Paramedic In Charge.  Because she was a newly promoted Paramedic In Charge, Ms. Murphy was placed in the Paramedic In Charge relief pool.  Numerous CFD firehouses offer private sleeping quarters for a Paramedic In Charge, and many had open spots during this time.  It therefore would not have created an undue hardship for the City to consider Ms. Murphy's need to pump in deciding where she would be detailed for each shift.  On information and belief, during the period of June 1, 2015 through approximately October 16, 2015, while Ms. Murphy was in the Paramedic In Charge relief pool, Ambulances 24, 51, and 35 had open spots and all were located at firehouses that would have offered Ms. Murphy access to a clean, private, non-

bathroom space for expressing breast milk. Nevertheless, CFD continued to detail Ms. Murphy to ambulances at firehouses that did not accommodate her needs as a nursing mother.

**ANSWER:** **The City admits Plaintiff was promoted to Paramedic in Charge on June 1, 2015 and further admits that as a newly promoted Paramedic in Charge, Plaintiff was placed in the relief pool. The City admits only that it has openings from time to time at various of its Ambulances and admits only that its firehouses offer varying facilities. The City denies it purposefully detailed Plaintiff to any particular firehouse. The City further denies that all of the Ambulances identified by Plaintiff are located in firehouses with private accommodations for nursing members. The City further denies Plaintiff requested a reasonable accommodation after she was returned to active duty, or raised any concerns about her assignments to the City's attention until about October 2015. Because Plaintiff did not request an accommodation, the City lacks sufficient knowledge or information to form a belief regarding the truth of whether it would have created an undue hardship to only assign Plaintiff to certain firehouses.**

74. Numerous CFD firehouses also have private sleeping quarters designated for use by individual fire officers. Ms. Murphy regularly asked individual officers for permission to use their sleeping quarters to pump. However, permission to use the fire officers' sleeping quarters depended entirely on the whims of the individual officers, who frequently told Ms. Murphy that she would have to pump in the restroom.

**ANSWER:** **The City admits many of its firehouses include private sleeping quarters. The City lacks sufficient knowledge or information to form a belief regarding the truth of the remaining allegations contained in paragraph 74.**

75. While the City frequently detailed Ms. Murphy to ambulances at firehouses that lacked private, non-bathroom space accessible to Ms. Murphy for expressing breast milk, the City routinely considers other personal needs in allocating shift assignments. For example, the City rearranges shift assignments to ensure that certain paramedics will not be detailed to the

21

same ambulance as partners with whom they do not get along.  On information and belief, the City also has temporarily detailed paramedics to specific ambulances of their choice to accommodate the need to be closer to a sick family member and has granted temporary detail assignments to accommodate disabilities or medical or other conditions.  The City also details CFD employees to the Bureau of Logistics according to a "Last Chance Agreement" process by which the City accommodates CFD employees who test positive for drugs or alcohol.

**ANSWER:    The City denies it detailed Plaintiff to any particular firehouse for discriminatory reasons and affirmatively states that Plaintiff did not request an accommodation upon return to active duty.   The City lacks sufficient knowledge or information to form a belief regarding the truth of the remaining allegations contained in paragraph 75, as there are no names or time frames offered**

76.    The City's repeated unlawful denials of accommodations for expressing breast milk caused Ms. Murphy economic loss and emotional distress.

**ANSWER:    The City denies it engaged in unlawful activity and denies the remaining allegations contained in paragraph 76.**

**The City Retaliated Against Ms. Murphy**

**ANSWER:    To the extent this unnumbered paragraph attempts to accuse the City of wrongdoing, denied.**

77.    In addition to unlawfully denying Ms. Murphy accommodations for pumping, the City retaliated against Ms. Murphy as a result of her requests for accommodations and complaints about the City's repeated refusals to accommodate her.

**ANSWER:    The City denies it acted unlawfully, denies Plaintiff made requests for accommodations and denies the remaining allegations contained in paragraph 77.**

78.    As detailed above, during retraining on April 8, 2015, Ms. Murphy made repeated requests to Instructor Scott for reasonable accommodations in order to express breast milk and complained about the unlawful denial of such reasonable accommodations.  In response, Instructor Scott retaliated against her by requiring her to perform additional "ride time" days after she completed retraining and by requiring her to stay at retraining later than other employees.

22

**ANSWER:** **The City restates its answers to the unidentified paragraphs referred to in paragraph 78 by use of Plaintiff's phrase "as detailed above."**

79.     CFD typically requires employees returning from leave to perform one or two ride time shifts, as is evidenced by CFD's Reinstatement Work Sheet, which is designed for an instructor to assign at most two days of ride time (with blank spaces labeled "Ride Day I" and "Ride Day 2"). Ride time days are less desirable than traditional shifts because the pay is lower and the scheduling is for daily S-hour shifts instead of periodic 24-hour shifts.

**ANSWER:** **Denied.**

80.     At the start of Ms. Murphy's retraining on April 8, 2015, Instructor Scott asked Ms. Murphy which ambulance she wanted to work with for her required ride time after she had completed retraining.  Ms. Murphy stated that she would like to do her ride time on Ambulance 21, which was convenient because it was near her home. Instructor Scott agreed and wrote down on the Reinstatement Work Sheet that Ms. Murphy would be assigned to Ambulance 21 for two days of ride time on April 9 and April 10, 2015.

**ANSWER:** **The City admits the allegations of paragraph 80, except that it denies that the only ride time days being assigned at that time were on April 9 and April 10, 2015, and states that all four days of ride time were scheduled at the same time.**

81.     However, at the end of the day, after Ms. Murphy had repeatedly asserted her right to reasonable breaks for pumping and complained about the unlawful denial of such accommodations, Instructor Scott added two additional ride time days that Ms. Murphy was required to perform before returning to active duty. In addition, he scheduled her to perform the third and fourth days of ride time at Ambulance 34, which is one of the busiest CFD ambulances and is located on the other side of the city from Ambulance 21 and from Ms. Murphy's home. Instructor Scott did not offer Ms. Murphy any explanation as to why she was required to complete more ride time days than is typically required of an employee returning from leave. He also did not provide any reason for placing her at Ambulance 34 for her two final days of ride time.

**ANSWER:** **The City denies it behaved unlawfully and denies Plaintiff made accommodation requests.  The City denies the remaining allegations contained in paragraph 81.**

82.     In addition, Instructor Scott required Ms. Murphy to stay in retraining on April 8 longer than the two male firefighters who were also in retraining that day. The male firefighters were permitted to leave retraining on April 8 at around 2:00 or 2:30 p.m.  Instructor Scott required Ms. Murphy to stay to watch additional training videos until approximately 4:00 p.m. The additional training videos Ms. Murphy was required to watch had been created approximately six years earlier and did not reflect current CFD procedures.

**ANSWER:     The City admits only that each CFD employee returning from medical leave is sent to training for various lengths of time based upon the length of each employee's leave which can vary greatly.  The City denies the gender of the firefighters who trained on April 8 affected the length of their training.  The City admits that some of its training materials may be 6 years old or older, but denies that its training materials do not reflect current CFD procedures. The City denies Plaintiff was solely required to watch additional training videos, and states that she performed other retraining activities as well.  To the extent Plaintiff is alleging she should not have been required to view the training videos, that allegation is denied.**

83.     Ms. Murphy believes that Instructor Scott required her to stay later than the other employees in retraining that day in retaliation for her requests for reasonable accommodations to express breast milk and for complaining about the unlawful denial of such reasonable accommodations.

**ANSWER:     The City lacks sufficient knowledge or information to form a belief regarding the truth of what Plaintiff believes.  The City denies Plaintiff made accommodation requests and denies the remaining allegations contained in paragraph 83.**

84.     Other City employees also retaliated against Ms. Murphy because of her requests for accommodations for pumping and assertion of her legal rights, including by detailing her to ambulances that were located in firehouses that did not have appropriate facilities to accommodate her need to pump in a private, non-bathroom space and by referring to her in derogatory terms.

**ANSWER:     Denied.**

24

85.     Shortly after the April 8 incidents, Ms. Murphy submitted a grievance through her union regarding her experience on that day. The union denied the grievance on the grounds that the incidents did not involve a contractual issue.  Ms. Murphy also complained to an investigator in the City's EEO Division about her experience on April 8.  On information and belief, this investigator contacted employees in CFD's Human Relations Division and Training Division, including Instructor Scott, about Ms. Murphy's complaint.  As a result, Ms. Murphy's requests for pumping accommodations and complaints about the City's refusal to provide them became common knowledge within CFD in April 2015.

**ANSWER:     The City lacks sufficient knowledge or information to form a belief regarding the truth of whether Plaintiff filed a grievance with her union or the outcome thereof.  The City admits Plaintiff contacted the City's EEO Division and admits the City's EEO Division spoke to CFD employees.  The City denies the remaining allegations contained in paragraph 85.**

86.     Thereafter, from approximately April 2015 through October 2015, the City retaliated against Ms. Murphy by detailing her to undesirable assignments that would not accommodate her need to express breast milk.  Such assignments included ambulances located at firehouses with no private, non-bathroom space available to Ms. Murphy for expressing breast milk, as well as ambulances known to be busy, which would hinder Ms. Murphy's efforts to secure reasonable break time to express breast milk.

**ANSWER:     The City denies that it retaliated against Plaintiff and denies it assigned Plaintiff in order to discriminate against her.**

87.     For example, the City detailed Ms. Murphy to Ambulance 50 for approximately five (5) shifts during April and May 2015. Ambulance 50 is commonly considered to be an undesirable assignment because it is very busy. It is also located in an older firehouse where Ms. Murphy regularly was required to express breast milk in a dirty restroom.

**ANSWER: The City denies Plaintiff was detailed to Ambulance 50 for five shifts during the period identified.  The City lacks sufficient knowledge or information to form a belief as to the truth of what is commonly considered a desirable assignment.  The City admits Ambulance 50 is located in an older firehouse that includes private sleeping quarters.  The**

25

**City lack sufficient knowledge or information to form a belief as to the truth of the conditions of the restroom and denies Plaintiff was required to express breast milk in a dirty restroom. Further answering, the City denies Plaintiff requested an accommodation upon her return to active duty.**

88.     On information and belief, these retaliatory shift assignments were made by Assistant Deputy Chief Paramedic Verdie Allen ("Chief Allen"), who was in charge of assignments for paramedics in the relief pool on Ms. Murphy's shift at all times relevant to this action. Ms. Murphy was informed by more than one other employee at CFD that Chief Allen referred to her derogatorily as "Breast Milk" in April 2015 and stated that she would not detail "Breast Milk" to Ambulance 51, a less-busy assignment sometimes offered to female employees as an accommodation when they return from maternity leave.

**ANSWER:     The City admits Verdie Allen was in charge of assignments for paramedics in the relief pool containing Plaintiff at all times relevant to this action. The City lacks sufficient knowledge or information to form a belief as to the truth of what unidentified employees are alleged to have said.**

89.     The City's retaliation against Ms. Murphy caused her economic and emotional harm, including pain and suffering.

**ANSWER:     The City denies it retaliated against Plaintiff and denies the remaining allegations contained in paragraph 89.**

<u>**CLAIMS FOR RELIEF**</u>
<u>**COUNT I**</u>

**Pregnancy Discrimination in Violation of the IHRA, 775 ILCS 512-102(1)**

90.     Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:     The City incorporates its answers to all prior paragraphs as if fully restated here.**

91.     As described above, the City discriminated against Ms. Murphy based on her pregnancy, childbirth, and related condition (lactation), in violation of the IHRA, 775 ILCS 5/2-102(1).  The City's discriminatory actions included treating Ms. Murphy's leave for pregnancy and childbirth less favorably, upon her return to work, than leave for on-the-job injury or illness, and denying her reasonable accommodations for her pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

**ANSWER:     Portions of paragraph 91 are the subject of a motion to dismiss and no answer is made thereto.  The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 91.**

92.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

**ANSWER:     The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 92.**

## COUNT II

### Gender Discrimination in Violation of the IHRA, 775 ILCS 5/2-102(A)

93.     Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:     The City incorporates its answers to all prior paragraphs as if fully restated here.**

94.     As described above, the City discriminated against Ms. Murphy based on her gender, female, in violation of the IHRA, 775 ILCS 5/2-102(A).  The City's discriminatory actions included treating Ms. Murphy's leave for pregnancy and childbirth less favorably, upon her return to work, than leave for on-the-job injury or illness, and denying her reasonable accommodations for her sex-based and pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

**ANSWER:     Portions of paragraph 94 are the subject of a motion to dismiss and no answer is made thereto.  The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 94.**

27

95.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

**ANSWER:     The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 95.**

## COUNT III

### Failure to Provide Reasonable Accommodations for Pregnancy, Childbirth and Related Conditions in Violation of the IHRA, 775 ILCS 5/2-102(J)

96.     Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:     The City incorporates its answers to all prior paragraphs as if fully restated here.**

97.     As described above, the City failed to provide reasonable accommodations for Ms. Murphy based on her pregnancy, childbirth, and related condition (lactation), in violation of the IHRA, 775 ILCS 5/2-102(J).  The City's denials of reasonable accommodations included denying Ms. Murphy leave benefits as favorable as those provided to CFD employees who returned to work after leave for on-the-job injury or illness; failing to engage in the legally required exchange to determine effective reasonable accommodations for her pregnancy-related condition of lactation; and denying her reasonable accommodations for her pregnancy-related condition of lactation, including reasonable break time and a private, non-bathroom place to express breast milk.  Such accommodations would not have imposed undue hardship on the City.

**ANSWER:     Portions of paragraph 97 are subject to a motion to dismiss and no answer is made thereto.  The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 97.**

98.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's unlawful denials of reasonable accommodations.

**ANSWER:     The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 98.**

## COUNT IV

### Retaliation in Violation of the IHRA, 775 ILCS 5/6-101(A)

99.     Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:     The City restates its answers as if fully restated here.**

100.     As described above, the City retaliated against Ms. Murphy for requesting reasonable accommodations in order to express breast milk and for complaining about the unlawful denial of such reasonable accommodations, in violation of the IHRA, 775 ILCS 5/6-101(A).  The City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride time; requiring her to stay at retraining later than other employees who had not made such requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

**ANSWER:     Portions of paragraph 100 are subject to a motion to dismiss and no answer is made thereto.  The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 100.**

101.     Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

**ANSWER:     The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 101.**

## COUNT V

### Sex (Pregnancy) Discrimination in Violation of Title VII, 42 U.S.C. § 2000e et seq. (Disparate Treatment)

102.     Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:     The City incorporates its answers to all prior paragraphs as if fully restated here.**

103.     As described above, the City discriminated against Ms. Murphy based on her sex, female, and because of her pregnancy, childbirth, or related conditions, in violation of Title VII, 42 U.S.C. § 2000e et seq.  The City's discriminatory conduct included requiring Ms. Murphy to

remain on involuntary leave based solely on her pregnancy; denying her similar accommodations for pregnancy to those granted to non-pregnant employees; treating her leave for pregnancy and childbirth less favorably than leave for on-the-job injury or illness; and denying her reasonable accommodations for her sex-based and pregnancy-related condition of lactation even though it granted similar accommodations to other employees who were not lactating.

**ANSWER:** **The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 103.**

104. Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's discrimination.

**ANSWER:** **The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 104.**

## COUNT VI

### Sex (Pregnancy) Discrimination in Violation of Title VII, 42 U.S.C. § 2000e et seq. (Disparate Impact)

105. Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:** **The City incorporates its answers to all prior paragraphs as if fully restated here.**

106. As described above, at all times relevant to this charge, the City's use of the CFD Medical Procedure Order, and the CFD policy of treating off-duty injury leave less favorably than on-the-job injury leave, had a discriminatory disparate impact on pregnant female CFD employees which was not justified by business necessity.

**ANSWER:** **Paragraph 106 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

107. As described above, at all times relevant to this charge, the City's method for detailing shift assignments for its employees, including those in the relief pool, had a discriminatory disparate impact on lactating female CFD employees which was not justified by business necessity.

30

**ANSWER:** **Paragraph 107 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

108.    At all times relevant to this charge, less discriminatory alternatives to these practices existed which the City refused to adopt.

**ANSWER:** **Paragraph 108 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

109.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the disparate adverse impact imposed on female pregnant and lactating CFD employees by the City's practices.

**ANSWER:** **Paragraph 109 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

## COUNT VII

### Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)

110.    Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:** **The City incorporates its answers to all prior paragraphs as if fully restated here.**

111.    As described above, the City retaliated against Ms. Murphy for requesting reasonable accommodations in order to express breast milk and complaining about the unlawful denial of such reasonable accommodations, in violation of Title VII, 42 U.S.C. § 2000e-3(a). The City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride time; requiring her to stay at retraining later than other employees who had not made such requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

**ANSWER:** **The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 111.**

112.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

31

**ANSWER:** **The City denies it discriminated against Plaintiff and denies all remaining allegations contained in paragraph 112.**

## COUNT VIII

### Violation of the INMWA, 820 ILCS 260/1 et seq.

113.    Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:** **The City incorporates its answers to all prior paragraphs as if fully restated here.**

114.    As described above, the City deprived Ms. Murphy of her rights under the INMWA, 820 ILCS 26011 et seq., by failing to make reasonable efforts to provide her with reasonable break time and a private, non-bathroom space to express breast milk.

**ANSWER:** **Paragraph 114 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

115.    Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, because the City deprived her of her rights under the INMWA.

**ANSWER:** **Paragraph 115 is the subject of a motion to dismiss and, therefore, no answer is made thereto.**

## COUNT IX

### Retaliation in Violation of the FLSA, 29 U.S.C. § 215(a)(3)

116.    Ms. Murphy incorporates by reference all prior paragraphs.

**ANSWER:** **The City incorporates its answers to all prior paragraphs as if fully restated here.**

117.    As described above, the City retaliated against Ms. Murphy in violation of the FLSA, 29 U.S.C. § 215(a)(3). The City retaliated against Ms. Murphy for asserting her rights to

reasonable break time and a private, non-bathroom place to express breast milk, 29 U.S.C. § 207®(l), and for complaining when the City deprived her of these rights. The City's retaliatory actions included requiring Ms. Murphy to complete additional days of ride time; requiring her to stay at retraining later than other employees who had not made such requests or complaints; detailing her to assignments that would not accommodate her need to express breast milk at work; and referring to her derogatorily as "Breast Milk".

**ANSWER:** **The City denies it discriminated against Plaintiff and denies the remaining allegations contained in paragraph 117.**

118. Ms. Murphy suffered injury, both economic and otherwise, including emotional distress, as a result of the City's retaliation.

**ANSWER:** **The City denies it discriminated against Plaintiff and denies the remaining allegations contained in paragraph 118.**

## PRAYER FOR RELIEF

The City respectfully requests that this Court find in its favor and against Plaintiff and further:

a. Deny Plaintiff is entitled to a judgment declaring the City violated the IHRA, Title VII, the INMWA, and the FLSA;
b. Deny Plaintiff a permanent injunction;
c. Deny Plaintiff Compensatory damages;
d. Deny Plaintiff pre-judgment and post-judgment interest;
e. Deny attorney's fees, costs and litigation expenses; and
f. Such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

1. Plaintiff has failed to mitigate her damages.

2. To the extent Plaintiff seeks to rely on events and/or protected classes that are not within the scope of her EEOC Charge, such claims are barred by her failure to exhaust her administrative remedies.

3. Any acts occurring more than 300 days before Plaintiff filed an EEOC Charge complaining of said conduct are time-barred.

4. To the extent that Plaintiff seeks to claim that she was disparately impacted by a facially neutral policy, such differentiation was based on reasonable factors other than gender and/or pregnancy.

5. To the extent Plaintiff claims she was injured by the City's failure to adopt an enactment, pursuant to the Illinois Tort Immunity Act, the City is not liable to Plaintiff for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law.

6. Pursuant to the Illinois Tort Immunity Act, the City is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.

7. To the extent Plaintiff claims she was injured by an employee's exercise of discretion, pursuant to the Illinois Tort Immunity Act, a public employee is not liable for an injury resulting from his act or omission.

## **JURY DEMAND**

The City seeks a trial by jury.

Dated: May 19, 2017

                                   Respectfully submitted,

                                   EDWARD N. SISKEL
                                   Corporation Counsel
                                   of the City of Chicago

By:      */s/ Rena M. Honorow*
                                   RENA M. HONOROW
                                   DANIEL MYERSON

                                   Assistants Corporation Counsel

Employment Litigation Division
30 North La Salle Street, Suite 1020
Chicago, Illinois 60602
(312) 744-6922/4939